No. 75,185

STATE OF KANSAS, *Appellee,* v. MICHAEL L. BORNHOLDT, *Appellant.*

932 P.2d 964

Opinion filed January 31, 1997.

*Michael J. Helvey*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with him on the brief for appellant.

*David Lowden*, assistant district attorney, argued the cause, and *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

LARSON, J.: Michael Bornholdt appeals his jury convictions of criminal possession of a firearm and first-degree murder with the imposition of a hard 40 sentence for the shooting death of Jon Dreiling.

### Factual Background

In the spring of 1993, Jon Dreiling and Eric Day were arrested for drug-related offenses. Dreiling made a deal with the State and

agreed to testify against Day in a trial scheduled in September 1993.

In July and August 1993, Bornholdt told his friend Tracy Wheeler that Dreiling was a snitch and did not deserve to live. In July, Bornholdt approached Marian Cunningham and told her that a person involved in a drug case was willing to pay him to kill a State witness in that case. Cunningham claimed Bornholdt asked for her help because he knew the victim and did not want the victim to see his face. Bornholdt wanted Cunningham to distract this person while he shot him, in return for $2,000. Cunningham refused but did not contact the police.

About 4 p.m. on Saturday, August 21, 1993, Dreiling was in his vehicle waiting for a light at the intersection of Harry and Market Streets in Wichita. A man approached Dreiling from the rear and shot him in the back of the head. The man tossed the gun at Kirk Eck, who was stopped one lane over and behind Dreiling's vehicle, saying, "Here, [expletive], hold the gun." The man ran east on Harry, then turned north down an alley in between Market and Broadway Streets, throwing down his T-shirt and a rubber glove as he ran.

Eck described the man as having dirty blond shoulder-length hair, with a white shirt, and wearing shorts with lavender/purple biking shorts underneath. He thought the man had a mustache. Eck saw the man's face from about 3 feet away through an open window for a few moments before being hit in the left cheek by the gun. Police, suspecting Day was the gunman, showed Eck a photo array which contained pictures of six men, including Day, but not Bornholdt. Eck did not identify anyone in the array.

Around the time of the shooting, Lloyd Robinson was routing a stump north of Harry Street in the alley between Main and Market Streets. He saw a jogger running north toward him, whom he described as a white male, 5'10" to 6', slight to medium build, about 160 to 175 pounds, with collar-length sandy or dishwater blond hair, and an unshaven face. That evening Robinson discovered a murder had taken place and called the police, telling them the runner he saw had worn shorts and tennis shoes and had hair pulled up behind, but he did not think the man had worn a shirt.

Other witnesses at the scene included James Krueger, who was Dreiling's boss, and Twila Miller. Krueger was in a vehicle facing the parking lot on the south side of Harry and was preparing to turn north on Market when he heard the gunshot. As he was turning, he saw a man run toward a blue Geo Tracker, toss something inside, and run northward while peeling off a T-shirt. Krueger saw only the back of the man, but described him as Caucasian, around 6', with a wiry build and shoulder-length hair. Krueger told police at the scene that the man wore a T-shirt and purple biking shorts with shorts over them of an unknown color.

Miller was waiting at the intersection of Harry and Market in a Chevrolet Blazer just in front of Dreiling's vehicle. The windows of her vehicle were tinted, and she wore tinted lenses. She saw a man approach the vehicle through her side mirror. She described him as a white male, 5'7" to 5'8", early 20's, about 130 to 135 pounds, with dark brown to black hair and a full beard.

The police found a styrofoam cup, with a lid and straw, on top of Dreiling's vehicle, recovered a gun from the passenger floorboard of Eck's Tracker, and found a white T-shirt with an MCI logo in a yard adjacent to the alley between Market and Broadway. Bornholdt and his former girlfriend had worked at MCI; his girlfriend's MCI T-shirt was missing. A plastic glove and a dark brown to black hair were entangled in the shirt. No fingerprints were recovered from any of these items, and the hair did not match Bornholdt's.

Between 6 and 8 p.m. the evening of the shooting, Bornholdt drove up to Marian Cunningham's home and, while still in his car, told Cunningham: "I did it, I did it." Bornholdt was wearing pink spandex shorts, with faded blue or green shorts over them, and tennis shoes. He was not wearing a shirt and was unshaven. Bornholdt went inside and explained that he had actually shot and killed Dreiling. Cunningham claimed that Bornholdt then reenacted the murder scene in her kitchen. Cunningham testified that Bornholdt told her he had walked up to the driver's window of Dreiling's car, put the gun behind Dreiling's ear, shot him, and then took off running through the alleys, ditching his disguise and gun along the

way. Bornholdt said he ran to his car and then drove by the murder scene a few times before driving to Cunningham's home.

Near the end of the following week, Cunningham discovered that a shooting had occurred in the area described by Bornholdt and decided to talk to the police. She identified Bornholdt from a picture. Certain details of Cunningham's story differed from what she initially told the police, from her testimony at the preliminary hearing, and from her trial testimony, but in all three she related substantially the same story previously stated.

After Cunningham had spoken to the police, they showed a photo array to Eck, who picked out Bornholdt as the possible suspect, but asked to see an individual lineup. Eck was not told he had selected correctly. The same lineup was shown to Miller, who was unable to identify anyone, and to Robinson, who said Bornholdt was his choice, but also was not told he had correctly selected the suspect.

On August 30, 1993, while trying to find Bornholdt, the police passed him driving in his car on the street and stopped him. He was transported to police headquarters for questioning, and his car was impounded. The police obtained permission to search his storage unit but were refused permission to search his car. After a short time, Bornholdt terminated the interview, and the police placed him under arrest.

The officers did an inventory search of his car. When they discovered a calculator-type pouch containing drug paraphernalia, the officers placed the pouch back inside, resealed the car, and obtained a warrant to search. They found drugs, drug paraphernalia, clothes similar to those worn by the killer, and a wallet with the name and phone number of Eric Day on papers inside. A search of the storage compartment procured a photograph of Bornholdt wearing a blue T-shirt and a pair of grey shorts over pink spandex shorts.

After Bornholdt's arrest, a live lineup of six people, including Bornholdt, was shown to Eck and Robinson. Eck identified Bornholdt and said he was 50 percent sure of the identification. Robinson chose the person next to Bornholdt, who was an undercover police officer.

Subsequent to the arrest, the police contacted Tracy Wheeler and later spoke to him at his attorney's office. At this time, Wheeler identified the weapon used to kill Dreiling as his missing gun and provided police with a letter supposedly sent to him by Bornholdt. Wheeler deciphered the letter, which he claimed indicated how much money Day owed Bornholdt for killing Dreiling. During this interview, Wheeler also admitted to using drugs and selling drugs to Dreiling. Wheeler has not been charged with any crimes as a result of these admissions or for keeping a firearm within 5 years of his release from imprisonment for a felony conviction.

Almost a year later, police received a packet of letters from Kevin Schaetzle that had been sent by Bornholdt. One letter, dated August 28, 1994, asked Schaetzle to convince a woman to testify that Bornholdt was with her the day of the murder. Bornholdt stipulated that his handwriting appeared on this letter.

In June 1994, Bornholdt was charged with first-degree murder under K.S.A. 21-3401(a) and criminal possession of a firearm pursuant to K.S.A. 21-4204(a)(2). At the preliminary hearing in July, both Eck and Robinson testified and had the opportunity to view Bornholdt. They both later identified Bornholdt with certainty at a hearing on pretrial motions in October 1994.

At the trial in late October 1994, Wheeler and Cunningham testified about Bornholdt's statements to them and admitted they had prior convictions for crimes involving truth or false statements. They stated they did not receive any deals in return for giving their testimony, although a police detective admitted to making a call in an attempt to get Wheeler into a drug treatment program. Eck and Robinson both positively identified Bornholdt at trial as the person they had seen at the crime scene.

The court permitted the State to introduce evidence regarding the drugs and drug paraphernalia and other items found in Bornholdt's car 10 days after the crime. Bornholdt did not testify but did attempt to discredit the eyewitness testimony and to cast doubt on the validity of his supposed statements by attacking the credibility of Wheeler and Cunningham. The court did not permit defense witness DeeAnn Krueger to testify that Dreiling had been frightened of a short Hispanic man named Antonio Guebara. Born-

holdt stipulated that he had been released from prison for robbery within 5 years of August 21, 1993.

The jury found Bornholdt guilty of both charges and, after a separate sentencing hearing, recommended a hard 40 sentence on the basis that Dreiling had been killed because of his duties as a witness in a criminal proceeding.

The trial court sentenced Bornholdt to life without parole for 40 years, plus 19 months in prison. Bornholdt raises 11 issues with numerous subissues. We will answer these issues in order, but none, either individually or collectively, show sufficient error to justify a new trial.

*Did the trial court commit reversible error in admitting Bornholdt's statements to Cunningham and Wheeler without holding a voluntariness hearing?*

The State concedes that Bornholdt's statements to Cunningham and Wheeler and the letter to Wheeler are in effect confessions under K.S.A. 60-460(f) and our holding in *State v. Green,* 254 Kan. 669, 682-84, 867 P.2d 366 (1994). Bornholdt concedes his counsel did not object at trial to the introduction of this evidence on K.S.A. 60-460(f) grounds or raise any question that his statements were other than voluntarily given.

If this were not a case where a hard 40 sentence had been imposed, this issue would fail because of our rule that in order to raise the admissibility of evidence as an issue on appeal, the record must show a timely and specific objection. K.S.A. 60-404; see *McKissick v. Frye,* 255 Kan. 566, Syl. ¶ 3, 876 P.2d 1371 (1994). However, because the hard 40 sentence was imposed, our review as mandated by K.S.A. 1993 Supp. 21-4627 requires that we "consider the question of sentence as well as any errors asserted in the review and appeal and shall be authorized to notice unassigned errors appearing of record if the ends of justice would be served thereby." See *State v. Collier,* 259 Kan. 346, 350, 912 P.2d 597 (1996). This direction does not require that we treat the record other than as it is presented to us, but we take the legislature's statutory direction as obligating us to consider "any errors asserted in the review and appeal."

Because Bornholdt made no objection and did not raise the question of voluntariness at trial, the only issue for us to decide is whether the trial court had the duty to raise such a question on his behalf. We hold that the trial court did not for the following reasons.

Bornholdt relies primarily on K.S.A. 60-460(f), which provides:

"Evidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, is hearsay evidence and inadmissible except:

. . . .

"(f) *Confessions.* In a criminal proceeding as against the accused, a previous statement by the accused relative to the offense charged, but only if the judge finds that the accused (1) when making the statement was conscious and was capable of understanding what the accused said and did and (2) was not induced to make the statement (A) under compulsion or by infliction or threats of infliction of suffering upon the accused or another, or by prolonged interrogation under such circumstances as to render the statement involuntary or (B) by threats or promises concerning action to be taken by a public official with reference to the crime, likely to cause the accused to make such a statement falsely, and made by a person whom the accused reasonably believed to have the power or authority to execute the same."

Bornholdt cites *State v. Baker,* 4 Kan. App. 2d 340, 342, 606 P.2d 120 (1980), in support of his contention that the voluntary nature of a statement must be established by a preponderance of the evidence and that the prosecution bears the burden of proving the statement is voluntary and admissible. However, in the *Baker* case, the voluntariness issue arose in the context of a motion to suppress a confession, pursuant to K.S.A. 22-3215. No such motion was made herein, nor was there any question but that the statements were voluntarily made by Bornholdt to his friends. Bornholdt cites no authority to support his assertion that the trial court has the duty to raise this issue on its own initiative. Yet, speaking directly on this issue, the United States Supreme Court stated in *Wainwright v. Sykes,* 433 U.S. 72, 86, 53 L. Ed. 2d 594, 97 S. Ct. 2497 (1977):

"Respondent also urges that a defendant has a right under *Jackson v. Denno,* 78 U.S. 368[, 12 L. Ed. 2d 908, 84 S. Ct. 1774] (1964), to a hearing as to the voluntariness of a confession, even though the defendant does not object to its admission. But we do not read *Jackson* as creating any such requirement. In that

case the defendant's objection to the use of his confession was brought to the attention of the trial court . . . and nothing in the Court's opinion suggests that a hearing would have been required even if it had not been. To the contrary, the Court prefaced its entire discussion of the merits of the case with a statement of the constitutional rule that was to prove dispositive—that a defendant has a 'right at some stage in the proceedings *to object* to the use of the confession and to have a fair hearing and a reliable determination on the issue of voluntariness . . . .' [Citation omitted.] Language in subsequent decisions of this Court has reaffirmed the view that the Constitution does not require a voluntariness hearing absent some contemporaneous challenge to the use of the confession."

Our court followed *Wainwright* in *State v. Miles*, 233 Kan. 286, 296, 662 P.2d 1227 (1983), where we held:

"We therefore conclude that Kansas procedure does, consistent with the United States Constitution, require that appellant's confession be challenged prior to or during the trial or not at all. The appellant's failure to request a hearing or timely object to the admission of his confession waives his right to raise that issue for the first time on appeal unless the opportunity to object did not exist."

It is clear that under *Miles*, a trial court has no duty to conduct a hearing before allowing a confession to be admitted into evidence absent some type of objection or motion from the defendant. 233 Kan. at 295-96.

Our obligation under K.S.A. 1993 Supp. 21-4627 to consider all errors asserted in the appeal even though a proper objection was not made below does not require us to become finders of facts or to make a determination upon which no record exists. *Collier*, 259 Kan. at 360.

Our holding in *Miles* is in no way undermined or altered by the obligation we recognized in *Collier*. The central issue remains whether the trial court was required on its own initiative to commence a hearing on voluntariness. *Miles* clearly states that it was not. The Kansas Supreme Court, along with the United States Supreme Court, has found no injustice in requiring defendants to raise the issue of voluntariness of their confessions at trial. Additionally, there is no showing of clear error in the admission of Bornholdt's confessions. To the contrary, nothing in the record suggests these statements were other than voluntarily given. This issue is without merit.

*Did the district court commit reversible error in preventing Born-holdt's cross-examination of Wheeler about drug activities to establish the witness' motive and bias?*

In *State v. Rinck*, 256 Kan. 848, 854, 888 P.2d 845 (1995), we noted:

> "The Confrontation Clause of the Sixth Amendment affords the accused the right to cross-examination. [Citation omitted.] A proper and important function of the right to cross-examination is the exposure of the witness' motivation in testifying. [Citation omitted.] Generally, the right to cross-examine witnesses is subject to evidentiary rules, and the trial court has broad discretion in controlling the examination. [Citation omitted.]
>
> "Error in restriction of cross-examination is subject to a harmless error standard if the reviewing court can declare beyond a reasonable doubt that the error had little if any likelihood of changing the result of the trial. [Citation omitted.] However, there are certain circumstances in which the denial of effective cross-examination amounts to a constitutional error of such magnitude that no showing of prejudice is required for reversal. [Citation omitted.]"

Bornholdt wanted to explore Tracy Wheeler's motivation and bias for testifying by cross-examining him about his drug use and sales to the victim. In a defense proffer, a detective testified that Wheeler admitted to possessing and using cocaine, selling marijuana, and possessing the murder weapon. Other than his statements to the police, there was no evidence against Wheeler, although he did not dispute making the statements. Wheeler said he was concerned with telling the truth and he did not receive any benefits in exchange for his statements.

After the defense proffer, the court held:

> "Regarding Tracy Wheeler's cross-examination, I think the drug usage is too remote, this alleged use of drugs or sale of drugs to the victim, any fear that he would have had of being prosecuted over his information that he gave to Detective Relph, that it is too remote to indicate that this witness would have had any concern about the potential charges coming out of his information."

The court did allow full cross-examination about Wheeler's link to the gun and whether he had been offered any deals for his cooperation. Defense counsel also fully cross-examined the detective about investigating Wheeler's incriminating statements regarding his possession of a firearm.

The present case appears to be similar to *Rinck*, 256 Kan. 848. There, Rinck argued he should have been allowed to cross-examine a juvenile witness about the amount of prison time the juvenile could have received had he been tried as an adult. We found that unlike *State v. Humphrey*, 252 Kan. 6, 845 P.2d 592 (1992), Rinck had been permitted to cross-examine the witness about his plea bargain and the witness had acknowledged that his juvenile punishment was a "slap on the wrist" compared to prosecution as an adult. As the trial court had not completely foreclosed cross-examination about the nature of the deal struck in *Rinck*, we ruled that even if the court had abused its discretion (which we did not appear to find), any error would have been harmless.

Here, the trial court allowed the defense to cross-examine Wheeler about whether a deal had been struck. Testimony was elicited that the detective had attempted to make some calls to get Wheeler into a drug treatment program, even though Wheeler's attorney was the person who eventually obtained his treatment. The court allowed full cross-examination as to the possession of the gun used to kill Dreiling and the possibility of charging Wheeler with possession of a firearm within 5 years of being released from prison for a felony conviction. Bornholdt presented no evidence indicating the State possessed any evidence other than Wheeler's admissions on which to base any charges against him.

Under all the circumstances, it cannot be said that the trial court unreasonably limited cross-examination. Even if any undue limitation were present, Cunningham's testimony, the eyewitness identifications, the defendant's attempt to pay a woman to give him an alibi, his presence near the scene of the murder, and the physical evidence linking him with the crime would all insure that any error would be harmless. We are not prepared to hold that the cross-examination was unduly limited, but even if we did, it would not be sufficient to change the result at trial. See *State v. Davis*, 256 Kan. 1, 17-18, 883 P.2d 735 (1994).

*Did the trial court commit reversible error by denying Bornholdt's motion to suppress evidence found in the search of his car?*

"If the findings of the trial court on a motion to suppress evidence are based on substantial evidence, this court on review will not substitute its view of the evidence for that of the trial court." *State v. Anderson*, 259 Kan. 16, 18, 910 P.2d 180 (1996).

Bornholdt contended at the trial court level that the search of his car cannot be supported by the legal grounds of a search incident to arrest or an inventory search. He believes the search was improper because he was nowhere near his car when arrested as required by K.S.A. 22-2501. He also claims the inventory search was illegal because it concealed an investigatory motive and because the car had been unlawfully impounded.

The State does not argue this was a permissible search incident to arrest, although at the time Bornholdt was apprehended, the police knew that two witnesses had tentatively identified him; that he had admitted the killing to Cunningham, who had accurately described how the murder occurred; and that Bornholdt lived out of his car. Our main focus, however, is on whether this was a permissible inventory search, as this is the State's principal justification for introducing the items found in the vehicle. Officers testified it was police procedure to inventory impounded vehicles in order to protect the police from claims of lost or stolen property. The testimony indicated the police carefully followed this procedure until they discovered evidence of drug crimes, and then they obtained a search warrant. The trial court agreed the inventory search was proper and stated the police could also have searched incident to the arrest. When the evidence was being introduced, defense counsel made a continuing objection.

All of the evidence indicates that police procedures were properly followed and that the police conducted a clearly proper inventory search. Substantial evidence supports the trial court's decision that the inventory search was justified. See *State v. Grissom*, 251 Kan. 851, 907, 840 P.2d 1142 (1992). Yet, for the first time on appeal, Bornholdt also argues his automobile was unlawfully impounded. This argument would not normally be considered because it was not raised below, *State v. Ji*, 251 Kan. 3, 17, 832 P.2d 1176 (1992); however, we will consider the issue because of our K.S.A. 1993 Supp. 21-4627 obligation as recognized in *Collier*.

There is no evidence that Bornholdt's car was improperly impounded. In *State v. Teeter*, 249 Kan. 548, 550-51, 819 P.2d 651 (1991), we reviewed the laws regarding inventory searches of impounded vehicles, stating:

"Under the Fourth Amendment to the U.S. Constitution, a search and seizure of evidence obtained without a warrant issued upon probable cause is *'per se* unreasonable . . . subject only to few specifically established and well-delineated exceptions.' [Citation omitted.] Inventory searches of vehicles lawfully impounded have been recognized as one of these few exceptions. [Citation omitted.] Inventory searches of vehicles serve three purposes: the protection of the owner's property while it remains in police custody, the protection of the police against claims or disputes over lost or stolen property, and the protection of the police from potential danger. [Citation omitted.]

"It is a well-known rule of law that an inventory search of a vehicle cannot be valid unless the police first obtain lawful possession of the vehicle. The police must have authorization by statute or ordinance to lawfully impound a vehicle, whether at the station house or other place of safekeeping. If the police do not have express authority to impound a vehicle, they may still take lawful custody of a vehicle when there are 'reasonable grounds' for impoundment. [Citation omitted.]"

The *Teeter* court noted the following situations that could give rise to reasonable grounds for impoundment:

" ' "[T]he necessity for removing (1) an unattended-to car illegally parked or otherwise illegally obstructing traffic; (2) an unattended-to car from the scene of an accident when the driver is physically or mentally incapable of deciding upon steps to be taken to deal with his property, as in the case of the intoxicated, mentally incapacitated or seriously injured driver; (3) a car that has been stolen or used in the commission of a crime when its retention as evidence is necessary; (4) an abandoned car; (5) a car so mechanically defective as to be a menace to others using the public highway; (6) a car impoundable pursuant to ordinance or statute which provides therefor as in the case of forfeiture." ' " 249 Kan. at 552.

We stated in *State v. Fortune*, 236 Kan. 248, 257, 689 P.2d 1196 (1984), that "[i]f the owner, operator or person in charge of the vehicle is readily available to make a determination as to the disposition of the vehicle then he may do so." However, in this case the record indicates Bornholdt's car was stopped in a lane of traffic and had to be moved to a private driveway in order to prevent it from obstructing traffic. There is no factual basis in the record indicating Bornholdt attempted to make any disposition of the ve-

hicle. The police were clearly obligated to take custody of it, have it impounded, and, ultimately, have it properly and lawfully inventoried.

The facts in this case are similar to those in *Fortune,* 236 Kan. 248. Here, Bornholdt was taken away from his vehicle by the police, and his vehicle was left unattended. The facts show no indication that Bornholdt's vehicle was unlawfully impounded. There is no way we can now decide the denial by the trial court of the motion to suppress was erroneous. Had some type of a record been developed below regarding impoundment of the vehicle, both parties would have had an opportunity to further develop this issue. Based on the record we have reviewed, we cannot find that Bornholdt's vehicle was clearly improperly or illegally impounded or that the trial court erred in allowing it to be inventoried. For any of the reasons stated, this issue has no merit. See *State v. Vandiver,* 257 Kan. 53, Syl. ¶ 5, 891 P.2d 350 (1995).

*Did the trial court commit reversible error by admitting as res gestae evidence the drugs and paraphernalia obtained from the search of Bornholdt's car?*

Defense counsel raised in a motion in limine and at trial specific objections to the State's introduction of testimony that drugs and drug paraphernalia were taken from Bornholdt's car at the time of his arrest. The described items included syringes, plastic and glass vials, and spoons for cooking drugs before injecting. The State also introduced specific testimony as to how the items could be used to inject illegal drugs.

The trial court reasoned the evidence was admissible as res gestae evidence because it showed Bornholdt's involvement with drugs and the whole theory of the State's case was that the murder was done in retaliation for the victim agreeing to testify in another drug case. The judge weighed the probative value against the prejudicial effect and found prejudice was minimal because the jury was aware Bornholdt had a criminal record and would not reasonably conclude from the possession of drugs that the defendant was guilty of murder.

Bornholdt first points out the compelling factor concerning this evidence—that it was found 10 days after the commission of the crime and no direct connection can be made between the drugs or drug paraphernalia and the commission of the murder. Bornholdt contends that the evidence did not have a natural or logical connection to Dreiling's murder, that the prejudicial effect outweighs the probative value, and that no limiting instruction was given to the jury concerning the purpose for which the drug evidence could be used.

Insofar as the alleged error is the improper ruling on Bornholdt's motion in limine, we apply the abuse of discretion standard of review. *State v. Rowell*, 256 Kan. 200, 208, 883 P.2d 1184 (1994). As relates to the admission of physical evidence, we said in *State v. Sexton*, 256 Kan. 344, 353, 886 P.2d 811 (1994):

"Subject to certain exclusionary rules, the '[a]dmissibility of physical evidence is within the sound discretion of the court and is to be determined by the court on the basis of its relevance and its connection with the accused and the crime charged.' *State v. Beard*, 220 Kan. 580, Syl. ¶ 3, 552 P.2d 900 (1976). In *State v. Ji*, 251 Kan. at 15, we said:

'[W]hen a physical object is offered into evidence and a question arises as to its connection with either the defendant or the crime charged, unless it is clearly irrelevant, the object should be admitted for such weight and effect as the jury sees fit to give it.' "

We have at times stated that evidence may be admissible which does not constitute a portion of the crimes charged, but which has a natural, necessary, or logical connection to the crime. *State v. McClanahan*, 254 Kan. 104, 116, 865 P.2d 1021 (1993). However, Bornholdt convincingly points out that we have also affirmatively stated that in order for matters to be admissible before, during, or after the happening of the principal event as a part of the res gestae, they must be "so closely connected with it as to form in reality a part of the occurrence." *State v. Davis*, 236 Kan. 538, 539, 694 P.2d 418 (1985).

Under the facts of this case, and specifically considering the 10-day lapse of time from the commission of the crime to the seizure of the items admitted, we see no justification for the admission of

the drugs and drug paraphernalia as a part of the res gestae of the crime. The admitted evidence is clearly not part of the res gestae.

We understand the State's contention that because the death of the victim was theorized to have resulted from his testimony in a drug case, anything relating to drugs would somehow have sufficient relevance to substantiate the connection. K.S.A. 60-401(b) provides that relevant evidence is evidence having any tendency to prove a material fact. To be admissible, evidence must be confined to the issues but need not bear directly upon them. *State v. Wagner,* 248 Kan. 240, 243, 807 P.2d 139 (1991).

Additionally, we stated in *Sexton,* 256 Kan. at 353:

"Twenty years ago, in *State v. Fagan,* 213 Kan. 587, 589, 518 P.2d 552 (1974), this court cited the following rule from 22A C.J.S., Criminal Law § 628, pp. 472-73: 'The rule is, generally, that evidence of the attending circumstances at the time an accused is arrested, including articles of property which are found in his possession, is relevant and admissible where the circumstances logically tend to connect the accused with the crime charged.' "

Once again, the connection between the evidence and murder in the present case requires an unrealistic leap of faith, and we are left with the undeniable conclusion that the admission of the drug and drug paraphernalia evidence was erroneous. Yet, because the evidence involved was only a small portion of an extended trial and the risk of prejudice is questionable, the need to reverse is open to doubt. We must therefore look to all of the facts and circumstances of the case to determine if the admission of the evidence was harmless error.

A good discussion of the question of harmless error in criminal cases is set forth in *State v. Sanders,* 258 Kan. 409, 418, 904 P.2d 951 (1995), where we stated:

"The admission or exclusion of relevant evidence in a criminal case is governed by two rules, the harmless error rule and the federal constitutional error rule. K.S.A. 60-261 sets out the harmless error rule. Error in the admission or exclusion of evidence by the court is not grounds for granting a new trial or setting aside a verdict unless refusal to take such action appears to the court inconsistent with substantial justice. At every stage of the proceeding, the court must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties. When reviewing the erroneous admission or exclusion of evidence, the error is harmless if no substantial right of the defendant is involved."

We set forth in *State v. Denney*, 258 Kan. 437, 443-45, 905 P.2d 657 (1995), the two statutory backgrounds for harmless error, K.S.A. 60-261 and K.S.A. 60-2105. In *Denney*, we recognized the large number of cases citing these two statutory provisions where trial results have been upheld despite error as not being "inconsistent with substantial justice," "having not affected the substantial rights of the parties," and being merely "technical errors and irregularities." See, *e.g., State v. Damewood*, 245 Kan. 676, 684, 783 P.2d 1249 (1989); *State v. Alexander*, 240 Kan. 273, 276, 729 P.2d 1126 (1986).

Under the facts of this case, Bornholdt was identified at the scene of the crime by two witnesses. He made admissions which amounted to confessions of the crime to two individuals who testified and were thoroughly cross-examined. Numerous items of physical evidence, including writings of Bornholdt, pointed to his involvement. Some items found in his vehicle which are not the subject of this objection on appeal did have a direct connection to the murder. When all of this evidence is considered, we hold the trial court's admission of the drugs and drug paraphernalia was harmless error under the facts and circumstances of this case.

*Did the trial court commit reversible error by allowing the in-court identifications of Bornholdt by Lloyd Robinson and Kirk Eck?*

Bornholdt moved to suppress the identifications by Lloyd Robinson and Kirk Eck, contending the pretrial identification procedures were unduly suggestive and the witnesses' ability to see Bornholdt on prior occasions tainted their identifications. The court disagreed with the argument, denied the motion, and allowed the identifications over the defense objections. The jury was completely instructed as to the various factors to consider when an identification of an accused was in issue. The two witnesses testified as follows:

Eck had the opportunity of seeing Bornholdt at pretrial hearings. He was not asked to identify him at the preliminary hearing but positively identified him at a suppression hearing. Eck testified that Bornholdt was clean-shaven with a different haircut at trial, but that he based his identification on his memory of Bornholdt's facial

features, actions, height, and weight on the day of the killing. Defense counsel thoroughly cross-examined Eck concerning the identifications.

Robinson saw Bornholdt at the preliminary hearing but was not asked to identify him. However, he did so at the suppression hearing and clearly identified Bornholdt at trial. Robinson admitted his identification was influenced by his observation at the hearings, but stated he tried to make his decision based upon what he observed on the day of the killing. Again, Robinson was fully and completely cross-examined.

"In reviewing a trial court decision regarding the suppression of evidence, we review the factual underpinnings of the decision by a substantial competent evidence standard of review and review the ultimate legal decision drawn from those facts de novo with independent judgment." *State v. Webber,* 260 Kan. 263, 274-75, 918 P.2d 609 (1996).

When deciding whether to exclude eyewitness identifications, we have held that the trial court must first determine if the identification procedure was unnecessarily suggestive. If so, then the court must decide whether that identification led to a substantial likelihood of a misidentification. *State v. Skelton,* 247 Kan. 34, 39-40, 795 P.2d 349 (1990).

In *State v. McIntyre,* 259 Kan. 488, 493, 912 P.2d 156 (1996), relying on *State v. Warren,* 230 Kan. 385, 390, 635 P.2d 1236 (1981), we listed several factors that should be considered when deciding whether to admit eyewitness identifications as reliable. These include:

"(1) the opportunity of the witness to view the defendant at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior descriptions of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation." 259 Kan. at 493.

In examining these factors as to both witnesses, we find that both had an opportunity and ability to see the suspect at or near the crime scene. Both witnesses stated their attention was focused. They both gave details and accurate descriptions of the suspect before the identification. The limitations of their identifications at

the lineups were fully and completely pointed out to the jury. Both testified positively that Bornholdt was the shooter, and an unreasonable amount of time had not transpired between the shooting and early identifications.

All the evidence points to the reliability of the identifications. Full opportunity to test the reliability of the identifications was given by reasonable and extensive cross-examination. The reliability of the identifications then became a question for the jury to determine. There was no error in the admission of testimony relating to the identification of the accused by Eck and Robinson.

*Did the trial court properly refuse to give an accomplice instruction and an informant instruction?*

Bornholdt's counsel requested pattern instructions on accomplice and informant testimony because of Tracy Wheeler's testimony. The State objected. The trial court found Wheeler's testimony did not show he was involved in the crime as an accomplice or he was an informant for the State.

The proposed instructions read:

"An accomplice witness is one who testifies that he was involved in the commission of the crime with which the defendant is charged. You should consider with caution the testimony of an accomplice." PIK Crim. 3d 52.18.

"You should consider with caution the testimony of an informant who, in exchange for benefit from the State, acts an agent for the State in obtaining evidence against a defendant, if that testimony is not supported by other evidence." PIK Crim. 3d 52.18-A.

In *State v. Cheeks*, 253 Kan. 93, 98-99, 853 P.2d 655 (1993), we said:

" 'In a criminal action, a trial court must instruct the jury on the law applicable to the defendant's theories for which there is supporting evidence. When considering the refusal of a trial court to give a specific instruction, the evidence must be viewed by the appellate court in the light most favorable to the party requesting the instruction.' *State v. Scott*, 250 Kan. 350, Syl. ¶ 4, 827 P.2d 733 (1992)."

The trial court, in refusing to give the accomplice instruction, held:

"First of all, on the defendant's request to include an accomplice witness instruction, I agree with the state—that's the reason I am not including this instruc-

tion in the packet—that there is no evidence indicating that any witness that has testified for the state is an accomplice in this case. And it would be a long stretch to say, from the evidence that's been presented, that any witness would fit that description. So, I am declining to give that."

In the present case, Wheeler never testified he was in any way involved with the crime. The only evidence linking Wheeler to the crime was that his gun was the murder weapon and that the killer may have worn a cap of Wheeler's. Wheeler testified he had no knowledge that Bornholdt had taken the gun or worn his cap. The additional fact that Bornholdt sent a letter to Wheeler concerning the alleged amount due from Day for the contracted killing does not implicate Wheeler in the killing. The letter itself did not mention or imply any involvement on the part of Wheeler.

There is simply no evidence which would justify or require the accomplice instruction. See *State v. Thomas*, 252 Kan. 564, 578-79, 847 P.2d 1219 (1993); *State v. Sanford*, 237 Kan. 312, 315-16, 699 P.2d 506 (1985). Viewing the evidence in the light most favorable to Bornholdt, we fail to find any reasonable inference from Wheeler's testimony that would require the giving of the accomplice instruction.

In considering the requested informant instruction, the trial court stated:

"[O]n the informant instruction, the same thing, that there is no evidence indicating that any witness for the state has received any benefits from the state in exchange for cooperation, that the only argument could be with Tracy Wheeler about a telephone call to arrange for drug treatment: but that is so minimal that I can't see that actually being a benefit and didn't appear to be in exchange for cooperation or testimony. It was something that was done independently of that.

"There is certainly no evidence indicating there was any agreement to not charge Tracy Wheeler or pursue any investigation on his involvement because of the gun. So, I just don't believe either one of those instructions should be given; and to give the instruction, the harm that could be done to the state is to have the appearance that the Court has made a finding that a witness is in fact an accomplice or that a witness is in fact a paid informant; and I think it would give an erroneous impression to the jury to give that instruction."

In *State v. Pennington*, 254 Kan. 757, 766, 869 P.2d 624 (1994), we found that a witness who shared a jail cell with the defendant was not a paid informant because he did not receive anything in

exchange for his testimony and he testified that he came forward out of disgust with what the defendant had told him. In *State v. Brinkley*, 256 Kan. 808, 816-17, 888 P.2d 819 (1995), we stated the record did not support the notion that two witnesses were paid informants.

Black's Law Dictionary 780 (6th ed. 1990) defines an informant as "[a]n undisclosed person who confidentially discloses material information . . . . This does not include persons who supply information only after being interviewed by police officers, or who give information as witnesses during the course of investigation."

In the present case there was no evidence, only speculation and supposition, that Wheeler received anything of tangible benefit by testifying for the State. The trial court was not required to give an informant instruction, especially in light of the fact that Wheeler's testimony was corroborated by other witnesses and Wheeler was fully cross-examined as to his history and involvement in the case.

*Did the trial court abuse its discretion in refusing to allow the defense to cross-examine Cunningham about whether her children had been in SRS custody?*

As previously stated, we apply the abuse of discretion standard when reviewing the district court's decision on a motion in limine. *Rowell*, 256 Kan. at 208. Additionally, "[r]ulings on relevance rest in the sound discretion of the district court." *Noel v. Pizza Management, Inc.*, 258 Kan. 3, 9, 899 P.2d 1013 (1995).

Bornholdt contends that the trial court erred in not allowing him to cross-examine Marian Cunningham about her children having been in SRS custody because the evidence was relevant to show that she was concerned by Bornholdt's threat to inform SRS that her son sold drugs.

This decision by the trial court did not prevent Bornholdt from exploring Cunningham's motive to fabricate her testimony. Bornholdt was able to establish that Cunningham did not like him because he had threatened to call SRS and had become physically abusive with her stepson. There is no question that irrespective of her children, Cunningham could have felt threatened by Bornholdt. The trial court allowed sufficient latitude on the cross-ex-

amination, and the decision not to allow further examination on this issue was not unreasonable. This was not an abuse of discretion.

*Did the trial court abuse its discretion by preventing the defense from presenting evidence that Dreiling had feared another person?*

The trial court denied Bornholdt's motion in limine requesting the right to present evidence that Jon Dreiling was threatened by and afraid of another person. The trial court agreed to revisit the issue after hearing testimony outside the presence of the jury from a defense witness.

Bornholdt proffered the testimony of DeeAnn Krueger to show that someone other than Bornholdt had reason to kill Dreiling. Krueger would have testified that Dreiling had feared Antonio Guebara and had wanted him to know he was not going to bring up his name. Guebara was a slim-built Hispanic man, 5'3", with dark hair and skin tone. After hearing the proffer, the trial court refused to allow the testimony, reasoning the State's case was based on direct evidence and the defendant was precluded from bringing in circumstantial evidence that a third party committed the crime.

In *State v. Johnson-Howell,* 255 Kan. 928, 948, 881 P.2d 1288 (1994), we held:

> "The defendant's right to present a defense is subject to the rules of evidence and the case law. *State v. Thomas,* 252 Kan. 564, 573, 847 P.2d 1219 (1993). The standard of review for a claim of improper exclusion of relevant evidence is whether the trial court abused its discretion in excluding the testimony. *State v. Walker,* 252 Kan. 117, 133, 843 P.2d 203 (1992)."

In *State v. Peckham,* 255 Kan. 310, 321, 875 P.2d 257 (1994), we said: " 'When the state relies on direct evidence, circumstantial evidence that someone other than the defendant committed the crime charged is irrelevant in the absence of other evidence to connect such third party with the crime.' *State v. Calvert,* 211 Kan. 174, Syl. ¶ 3, 505 P.2d 1110 (1973)."

There was no evidence linking Guebara to this crime. All the witnesses described the shooter as a taller, white male, and the description of Guebara did not at all match those given by the two witnesses who had the best opportunity to view the shooter. Here,

the State relied upon the direct evidence of eyewitnesses, and this speculative evidence was not admissible.

*Did the trial court abuse its discretion by admitting a photograph of Bornholdt and a letter written by Bornholdt?*

Bornholdt argues it was improper to admit a photograph found in his storage locker which shows him wearing clothes similar to those described by the eyewitnesses and Cunningham. Additionally, he contends the admission of the letter to Kevin Schaetzle, by which he attempted to obtain an alibi, was in error because there was no testimony the letter had not been altered and the letter was irrelevant.

Again, our scope of review is whether or not the admission of this evidence was within the discretion of the court. *State v. Friberg*, 252 Kan. 141, 147, 843 P.2d 218 (1992).

Photographs are admissible under proper foundation, and the one in this case showed Bornholdt wearing shorts similar to those taken from his car and those described by Cunningham and the witnesses to the murder. There was sufficient foundation for properly admitting the photograph. See *State v. Johnson*, 210 Kan. 288, 291, 502 P.2d 802 (1972). The letter provided additional evidence concerning the matter, it was written by Bornholdt as stipulated, and it indicated an attempt to fabricate an alibi for the time of the killing. See *State v. Rives*, 220 Kan. 141, 144, 551 P.2d 788 (1976). Both of the items of evidence were clearly relevant and probative to the issues in the case. This issue has no merit.

*Did cumulative trial errors deny Bornholdt a fair trial requiring reversal of his convictions?*

Bornholdt asserts that due to the number of errors committed at trial, their cumulative effect denied him the right to a fair trial. We have held that only the admission of the drug evidence was improper and that was harmless error. We found no other trial errors. There is no a cumulative amount of error requiring reversal under the totality of the circumstances in this case. See *Taylor v. State*, 251 Kan. 272, Syl. ¶ 6, 834 P.2d 1325 (1992). Bornholdt's claims of errors fail. We find Bornholdt received a fair trial and see no grounds to reverse his convictions or award him a new trial.

See *State v. Westfahl*, 21 Kan. App. 2d 159, 167, 898 P.2d 87, *rev. denied* 258 Kan. 863 (1995).

Affirmed.