No. 48,551

STATE OF KANSAS, *Appellee,* v. WILFRED MANTZ, *Appellant.*

(565 P.2d 612)

Opinion filed June 11, 1977.

*Robert L. Bates,* of Great Bend, argued the cause and was on the brief for the appellant.

*H. Philip Martin,* Special Prosecutor, of Larned, argued the cause, and *Curt T. Schneider,* Attorney General, was with him on the brief for the appellee.

The opinion of the court was delivered by

KAUL, J.: Defendant-appellant, Wilfred Mantz, appeals from a conviction by a jury of murder in the first degree. (K.S.A. 21-3401.) The weapon employed in the killing was a high-powered rifle owned by defendant. Defendant admits the shooting of the deceased, John Sharp, but claims the evidence was insufficient to establish premeditation. Defendant specifies eighteen separate points, four of which were emphasized in his oral argument on appeal.

Defendant grew up in Larned where he was a childhood friend of the deceased. Defendant was forty-one years of age at the time

of the killing on August 15, 1974, and had left Larned in 1948. He served two enlistments in the United States Army, after which he established a residence in California. During his residency in California defendant became acquainted with Joann Boyer whose affections later became the issue between defendant and John Sharp which culminated in the homicide. Defendant's first marriage had ended in a divorce when he met Joann Boyer in Oakland, California, where they set up housekeeping without the benefit of marriage.

In 1974 defendant decided to return to Kansas and Joann agreed to accompany him. They again set up housekeeping in Larned in April of 1974. Joann held herself out as defendant's wife and was introduced by him as "Joann Mantz" to friends and relatives. Defendant obtained a job at the Larned power plant and Joann obtained employment as a waitress in a local restaurant.

During his military service defendant became an expert rifleman and later acted as an instructor in the use of military rifles. He maintained his interest in rifles after his discharge from the army. Several weeks after the couple returned to Larned, Joann purchased a Ruger .44 magnum semiautomatic rifle, which she gave to defendant as a present. This rifle was the weapon used in the killing of John Sharp.

In June 1974 the deceased, John Sharp, also returned to Larned after serving in the army. Shortly after his return, Sharp was introduced to Joann by the defendant. This acquaintanceship shortly developed into more than a friendship. Sharp and Joann spent considerable time together in a local tavern, while defendant was working at the power plant, sometimes on the night shift. Early in July of 1974 defendant was informed that Sharp's car had been parked in front of his house while he was at work.

Robert Sharp, the deceased's brother, testified that on July 12 or 14, 1974, defendant called wanting to talk with him. Robert testified that defendant said he thought John was going with Joann; that Robert replied that he knew nothing about it, but that defendant wanted to talk about it and stated:

"'. . . I think John is going out with Joan.' I told him I knew nothing about it. He told me that he wanted to talk to me about it and he stated 'I think John is going with Joan, I'm going to kill the son of a bitch for it'. 'I thought I would come out and tell you what he was doing'. 'I thought I would just come out and tell you about it, if I kill him, you are going to be after me.' He said he was going to shoot John."

During the latter part of July and the early part of August the relationship between John and Joann intensified. There was evidence that Joann spent several nights away from defendant's home, apparently with John. Joann eventually moved into an apartment of her own. In three conversations during this time period, according to her testimony, defendant told Joann that John had denied any involvement with her and further stated:

" '. . . I promised Johnny if he had been lying to me I'll kill him.' . . ."

On August 13, 1974, Joann spent the night with the deceased. The following day, August 14, Joann met defendant, went out drinking with him and went home with him that night. She testified:

". . . We wanted to try to get back together, I was afraid because I didn't like the arguments that we had been having. . . ."

They also spent a part of the morning of August 15 together at the Blue Lounge. They made arrangements to meet that evening at the V.F.W. Club. Instead of meeting defendant, Joann remained at the Blue Lounge with the deceased and his brother, Robert, and several other friends. She testified that during the course of the evening she received several telephone calls from Joyce Mead, a friend of defendant's, who told her that she was at the V.F.W. Club with defendant and said: " 'Why don't you leave John alone and just come up here?' "

The defendant and Joyce Mead, who was with him at the V.F.W. Club, both testified as to the conduct of defendant during the evening of August 15. Joyce Mead described defendant's appearance in these words:

" 'Well, he didn't act violent or nothing; in fact, he was kind of calm. He wasn't drunk, I don't think. He might have had a few drinks but he wasn't drunk, and I didn't really take him serious, either.' "

The testimony of several witnesses disclosed that defendant left the V.F.W. Club about 11 p.m., drove to the Blue Lounge and parked nearby where he could observe the entrance of the lounge. Shortly thereafter, Joann, the deceased, and a mutual friend, Calvin Foss, emerged from the tavern and walked across the street to the deceased's automobile. As they were approaching the deceased's automobile defendant backed his automobile out of the parking stall and continued in reverse until he was almost

directly opposite the deceased's automobile. Thereupon, according to the testimony of Foss, Robert Sharp and a bystander, Danny Elmore, defendant yelled: " '. . . Johnnie, you mother . . . I'm going to shoot you,' and that was when he started pulling the trigger. . . .' " The deceased was struck in the chest, the thigh and foot. Other shots fired by defendant struck the deceased's automobile and a nearby parking meter. John Sharp died almost immediately.

After the shooting defendant drove directly to the police station and on arrival was described by several witnesses as throwing his arms in the air, hitting the radio, yelling that he had just shot a man and that he was sorry. Two police officers handcuffed defendant, read him the *Miranda* warning and took him to the county jail.

At trial the shooting scene was described by several witnesses, including the defendant who took the witness stand in his own defense. He described his life with Joann Boyer, both in California and at Larned, and admitted that he had talked to several people about shooting the deceased. He testified that when he went to the Blue Lounge, just prior to the shooting, he was upset and when he saw John Sharp, Calvin Foss and Joann leaving the Blue Lounge and cross the street together:

"I don't know what happened—I just felt this sudden anger or heat or whatever you want to call it, coming up from inside of me and I hollered and I said, 'Johnny, you son-of-a-bitch,' and the next thing I remember was the gun coming across in front of me like this and then everything just went black. I don't remember squeezing the trigger or anything, and then when I came around I seen the hole in the back door and I seen Johnny slouched against the front seat and he looked hurt, although I couldn't see any blood; and because of the hole in the back door I assumed that I had shot, and the only thing I could think of was I had to get him an ambulance—you know, and get help to him, and so I hollered and said that I was going to get an ambulance, and I drove—I just took off as fast as I could and I drove immediately to the police station or the power plant, and I didn't realize how late it was, and I started to go upstairs, then I realized that the police station was open, and I turned and dashed in there, and well—well, you know the testimony of the witnesses."

In his first point on appeal defendant contends the trial court erred in failing to grant his motion for a new trial on the grounds the verdict was contrary to the evidence and that there was no substantial evidence to support a finding of premeditation. The quantum of evidence to establish the element of premeditation in first degree murder was considered in the recent case of *State v.*

*Henson,* 221 Kan. 635, 562 P. 2d 51, wherein we quoted with approval from 1 Wharton's Criminal Evidence (13th Ed.), p. 227:

" 'Premeditation and deliberation can be found from various circumstances, such as the nature of the weapon used, the lack of provocation, the defendant's conduct before and after the killing, threats and declarations of defendant before and during the occurrence, or the dealing of lethal blows after the deceased was felled and rendered helpless.' " (p. 639.)

The weapon in the instant case was a high-powered, large-bore rifle, obviously a deadly weapon. Defendant admits that five shots were fired, three of which penetrated the victim's body. The record discloses that more than a month before the killing, defendant stated to the deceased's brother Robert that he was going to kill John because of his associations with Joann Boyer. The same threat was repeated on at least four or five occasions to other witnesses, including a statement to Joyce Mead, during the evening of August 15, that he was going to kill both Joann and John. Finally, immediately prior to the shooting, defendant swore at the deceased and yelled, "I'm going to shoot you." Defendant's conduct here closely parallels that of the defendant in the first degree murder case of *State v. Greenwood,* 197 Kan. 676, 421 P. 2d 24, wherein defendant stated:

" 'I was mad and drunk, and I just walked up to the car and pulled the trigger of the gun I had. I think I shot Lucille first, and then shot Johnny second. Have no idea how many times I fired the gun.' " (p. 686.)

In considering the evidence in *Greenwood,* we noted the presumption that a man is presumed to do that which he actually does and to intend the consequences which naturally and probably flow from his voluntary act. (citing *State v. Donahue,* 197 Kan. 317, 416 P. 2d 287.) We also observed that malice in law may be inferred from the use of a deadly weapon.

A reading of the record in the instant case discloses an abundance of evidence for the jury to draw an inference of premeditation and malice aforethought, as well as intent to kill the deceased. There was substantial evidence presented to establish all elements of first degree murder.

Defendant next asserts he should be awarded a new trial on the ground that his court-appointed attorneys were incompetent. We first take note that, apparently because of the seriousness of the charge, two attorneys were appointed by the trial judge to represent defendant. In general, defendant claims that one of his

attorneys was newly arrived in Kansas and inexperienced in our jury trial procedure, and that the other attorney was appointed eighteen days prior to trial, which lessened the opportunity to thoroughly familiarize himself with the case. We find no request for a continuance in the record. Neither do we find any complaint by trial counsel as to the need for more time for preparation. Our examination of the record discloses that counsel did an adequate job of representing the defendant against an inherently strong case presented by the prosecution. Both attorneys were members of the Kansas Bar in good standing and may be presumed to be competent. In the recent case of *Lee v. State,* 220 Kan. 221, 552 P. 2d 626, the applicable rule was stated in these words:

"Whenever the court in good faith appoints or accepts the appearance of a member of the bar in good standing to represent a defendant, the presumption is that such counsel is competent. To constitute a denial of an accused's constitutional rights it must clearly appear that the representation of accused was wholly ineffective and inadequate. The burden is on the petitioner to show representation by his attorney was so incompetent that the total effect was that of complete absence of counsel. . . ." (p. 222.)

See, also, *State v. Henry,* 219 Kan. 310, 548 P. 2d 808; and *Schoonover v. State,* 218 Kan. 377, 543 P. 2d 881.

Defendant next complains concerning endorsement by the state of additional witnesses on the day of trial. The record discloses the state filed a request, six days before the date of trial, in which three witnesses were named. Notice of the request was served on defendant, but no objection was made as to these three witnesses. Immediately prior to trial, the state sought and added a fourth witness to which an objection was lodged by defendant and sustained by the trial court. We find no abuse of discretion shown. (*State v. Rogers,* 217 Kan. 462, 537 P. 2d 222; and *State v. Blocker,* 211 Kan. 185, 505 P. 2d 1099.)

For his fourth point defendant contends he was prejudiced by the warrantless search of his automobile. This concerns the taking by a police officer of defendant's rifle from the seat of the automobile and five spent shell casings, one of which was on the ground beside the automobile as it was parked in front of the police station. There was testimony that the objects in question were in the plain view of the officer who removed the same and were also observed by other witnesses prior to removal. Since the objects were in plain view there was no search. (*State v. Boone,* 220 Kan. 758, 556 P. 2d 864; and *State v. Huff,* 220 Kan. 162, 551 P.2d 880.)

Defendant next complains that Officer Slack was permitted to testify as to technical evaluations of the trajectories of the bullets when he was not qualified as an expert. There was no objection to Officer Slack's testimony at trial. Moreover, his testimony was that he had received special training at the Police Academy in sudden death seminars, as well as knowledge gained from his experience with the Larned Police Department. His testimony was mainly directed toward establishing the parallel paths of the bullets fired by defendant which was relative to the issue of intent. He gave no testimony concerning ballistics identification. Defendant also complains that Dr. W. R. Brenner, a pathologist who performed the autopsy, was permitted to testify as an expert without being so qualified. Dr. Brenner testified that he was district coroner. Again no objection was made as to Dr. Brenner's qualifications. We find no merit in defendant's contentions concerning the testimony of either Dr. Brenner or Officer Slack.

Defendant next complains of error in the admission of testimony concerning bullet wounds of the deceased and a reference to pools of blood at the crime scene and photographs depicting the same. Defendant says the evidence was unduly inflammatory. We do not agree. Officer Leon Schearer described a bullet wound as being large enough to have permitted the insertion of his thumb. The court overruled defendant's objection, but cautioned the witness that his testimony was approaching an inflammatory level. The testimony in question came as a part of Shearer's overall description of the scene of the crime and was explanatory as to whether the wound in question was an entrance wound or an exit wound which was relative to the manner of the shooting and bore on the issue of intent.

There were several photographs of the deceased's automobile depicting shattered glass and bullet holes. In two of the photographs what appears to be small pools or puddles of blood were shown upon the pavement near the automobile of decedent. Neither of the photographs could be described as gory nor gruesome. (*State v. Childers,* 222 Kan. 32, 563 P. 2d 999; and *State v. Steward,* 219 Kan. 256, 547 P. 2d 773.)

Defendant's point eight is directed at hearsay testimony by the witness Joyce Mead concerning a statement made to her by Joann Boyer, that the defendant was going to kill the victim, John

Sharp. The testimony was cumulative of properly admitted evidence through the testimony of other witnesses, including the defendant himself. Under the circumstances the admission of the evidence does not rise to the level of reversible error. (K.S.A. 60-261.)

Defendant next contends the trial court improperly rejected his proposed "do what you think is fair" instruction as embodied in PIK[Criminal] 51.03, p. 36. The trial court correctly deleted the proposed instruction on the objection of the state. The proposed instruction was disapproved for use in Kansas in *State v. McClanahan,* 212 Kan. 208, 510 P. 2d 153; and this holding was followed in *State v. Gustin,* 212 Kan. 475, 510 P. 2d 1290. What was said in *McClanahan* is dispositive of the contention herein raised:

"The so-called 'do what you think is fair' instruction set forth in PIK Criminal 51.03 is disapproved for use in Kansas. The administration of criminal justice in this state would not be served by approving either the theory or form of such an instruction. The tenor of the instruction militates against our generally accepted law as to the diverse functions of court and jury. . . ." (p. 215.)

In point ten defendant contends:

"The court erred in denying a new trial for the defendant on the grounds that the prosecution had failed to make a bona fide effort to restrain or to locate the missing witness, Joan Mantz (Boyer)."

In the instant case a subpoena was issued by the prosecution for the attendance of Joann Boyer. Copies of this subpoena were forwarded to the sheriffs of two California counties. A "Followup Report" detailing efforts of one California sheriff to locate the witness appears in the record. Apparently, the other sheriff's department was also unable to locate the witness. The trial court expressly found that diligent efforts were made by the state to try to locate the witness. Under these circumstances any attempt to obtain compulsory process via the Uniform Act to Secure Attendance of Witnesses From Without State (K.S.A. 22-4201, *et seq.*) would have been a useless act. (*State v. Bey,* 217 Kan. 251, 535 P. 2d 881.) No abuse of discretion is shown in the ruling complained of by defendant.

Defendant's next two points concern testimony relating to a prior conviction of defendant in California. The subject of the prior conviction was first brought out by defendant in his own testimony on direct examination. Defendant testified:

"I was convicted of disturbing the peace in California, and that's the only crime I have ever been convicted of in any state."

On cross-examination of defendant it was brought out that the original complaint in the California case charged assault with a deadly weapon and that the complaint was filed by his ex-wife. After defendant had testified to matters surrounding the California conviction, an objection to a further question was lodged, apparently on the grounds of repetition. This objection was sustained. The matter was again brought up on cross-examination of Jack Stittsworth, who had been called as a character witness by defendant. Mr. Stittsworth was asked by the prosecutor if he had heard of defendant's prior conviction in California. An objection was made. The trial court found that defendant had put his character into the trial, but nevertheless sustained the objection. We find no prejudicial error shown in either of the two points raised by defendant.

The defendant next complains because the trial court refused to permit the jury to view the scene of the crime. After discussing the matter with counsel, the court denied the request. Allowing the jury to view the scene of a crime is at the discretion of the trial court. (*State v. Morton,* 217 Kan. 642, 538 P. 2d 675; *State v. Winston,* 214 Kan. 525, 520 P. 2d 1204; and *State v. Beasley,* 205 Kan. 253, 469 P. 2d 453, cert. denied, 401 U. S. 919, 27 L. Ed. 2d 821, 91 S. Ct. 903.) Exercise of that discretion will not be overturned on appeal unless its abuse is apparent.

Defendant relied heavily upon his point fourteen at oral argument and in his brief. This concerns an in-chambers conference among court and counsel in the absence of defendant concerning instructions. After a recess for the night, at a day late in the course of the trial, the trial court met with counsel and a brief discussion was had concerning instructions. The following morning the court held a final conference on instructions with the defendant present. At this time the court observed that the conference of the previous evening was in the absence of defendant. In response to the court's comment concerning defendant's absence at the previous conference, defendant's counsel consulted defendant about the matter and asked defendant, "Is it all right with you that we did this; that we're going to go over them again today." The defendant replied, "Yes, fine." The court then proceeded to go over all the instructions with counsel. Defendant

now contends that his absence at the first conference on instructions amounted to reversible error requiring a new trial. Our statute concerning the presence of a defendant in a felony case is K.S.A. 22-3405(1), which reads:

"(1) The defendant in a felony case shall be present at the arraignment, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by law. In prosecutions for crimes not punishable by death, the defendant's voluntary absence after the trial has been commenced in his presence shall not prevent continuing the trial to and including the return of the verdict. A corporation may appear by counsel for all purposes."

Defendant cites *State v. Cade,* 210 Kan. 544, 502 P. 2d 782, which involved the dismissal of an appeal by the defendant in a misdemeanor case because of defendant's absence when the case was called for trial. The *Cade* case has no bearing on the issue here. The Judicial Council comment, following the statute, reflects that it incorporates parts of F. R. Cr. P. 43 (3 Wright, Federal Practice and Procedure [Criminal], Rule 43) and 8 Revised Code of Montana [1947], Criminal Procedure, Sec. 95-1904. An examination of Federal Rule 43, reveals that the first paragraph thereof is substantially the same as the first paragraph of the Kansas statute. In federal cases involving the rule, courts have ordinarily allowed convictions to stand despite defendant's absence from in-chambers conferences, reasoning that this kind of conference is not a stage of the trial within the meaning of the rule or that defendant was not prejudiced since only legal matters were discussed and his counsel was there to speak for him. (3 Wright, Federal Practice and Procedure [Criminal], 1976 Pocket Part, Rule 43, Sec. 721, p. 195. See, also, *Deschenes v. United States,* 224 F. 2d 688 [10th Cir. 1955].)

With reference to the Montana statute the Montana Revision Commission comments:

"The settlement of instructions being no part of the 'trial,' within the meaning of former section, the absence of one charged with felony during such settlement does not constitute reversible error. . . ." (Sec. 95-1904, pp. 555-556.)

In *State v. Hall,* 55 Mont. 182, 175 Pac. 267, it was held the settlement of instructions being no part of a trial within the meaning of the statute, the absence of a felony defendant did not constitute reversible error. The *Hall* case was decided under a forerunner of the present Montana statute, but it is relied upon by

the Commission as to what constitutes a part of the trial under the present statute.

The general rule clearly appears to be that a defendant's constitutional and statutory rights to be present at his trial do not encompass proceedings before the court involving matters of law. Such rights are violated only if the defendant is absent when the jury is hearing the case or where he is prevented from such other proceedings where his presence is essential to a fair and just determination of a substantial issue. (21 Am. Jur. 2d, Criminal Law, Secs. 289-290, pp. 318-320; 85 A. L. R. 2d, Anno., p. 1111.)

Except for *State v. Cade,* supra, this court has not considered K.S.A. 22-3405 and its predecessors for many years. The statute specifically requires defendant's presence, ". . . at the arraignment, at every stage of the trial including the impaneling of the jury and the return of the verdict, . . ." We believe this to mean that defendant must be present at all times when the jury is present in the courtroom, except where the defendant is voluntarily absent, as set forth in the statute.

In *State v. Myrick,* 38 Kan. 238, 16 Pac. 330, the jury during its deliberation requested further instructions from the court. The request was submitted to defendant's counsel, who stated they had no objections to the granting of the request providing the court submitted a further instruction in addition to that requested. The court complied with the request of counsel, the jury was recalled to the courtroom and instructed accordingly, all of which took place in the absence of defendant. On appeal this court reversed the conviction holding:

"Section 207 of the criminal code prohibits the trial of any person accused of felony unless he is personally present throughout the trial; and it is therefore error for the court, in a prosecution for felony, to recall the jury and give further instructions while the defendant is absent and under confinement in jail." (Syl. 1.)

The *Myrick* case was cited with approval in *State v. Clifton,* 57 Kan. 448, 46 Pac. 715, wherein the hearing on a motion to quash the information in a felony prosecution was held to be a part of the trial requiring the defendant's personal presence.

In the case at bar we are only concerned with defendant's absence at an in-chambers conference concerning instructions. No instructions were submitted to the jury in the absence of defendant, as was the case in *Myrick.* While we believe it to be the better practice to require a defendant's presence at all times

during the course of his trial, we find no constitutional rights or rights under the statute violated. K.S.A. 22-3405 is mandatory and must be carefully complied with. However, the in-chambers conference in the instant case, in which no final decision as to instructions was made, cannot be said to be a part of or a stage of the trial within the meaning of the statute. Our holding here does not overrule *Myrick* to the effect that a defendant must be present whenever instructions are submitted to the jury. Our holding is only applicable to in-chambers conferences or off the record discussions between court and counsel at the bench involving only matters of law where a defendant's presence is not essential to a fair and just determination of some substantial issue.

Points fifteen and sixteen are directed to statements made by the prosecutor in his closing argument. We have examined the argument, reproduced in the record, with respect to the points made by defendant and find his contention to be entirely without merit. Defendant also complains that the prosecutor made a deliberate misstatement in his opening statement concerning the time at which the murder weapon was purchased. The court gave the usual instruction to the effect that statements of counsel are not evidence. Defendant failed to object to the statement at trial and we find no basis for reversal in this regard. (*State v. Campbell*, 210 Kan. 265, 500 P. 2d 21.)

Finally, defendant contends that the testimony of Officer Slack in his redirect examination, in the form of an opinion, that defendant was not drunk was erroneous in that no foundation had been laid for such opinion testimony. Officer Slack was questioned at length on direct and cross-examination concerning defendant's appearance and conduct upon his arrival at the police station after the shooting. These matters were again gone over on his redirect examination during which he expressed the opinion complained of. Officer Slack testified as to his years of experience with the police department, his training at seminars and the police academy. His testimony, about which the complaint is lodged, was merely a comparison of the appearance of defendant with that of other drunk persons that he had dealt with. We find no error in this regard.

We have carefully examined all of the points raised by defendant's industrious counsel and find no reversible error shown.

The judgment is affirmed.