No. 77,966

STATE OF KANSAS, *Appellee*, v. JEROME EDWARDS, *Appellant*.

(955 P.2d 1276)

Opinion filed March 6, 1998.

*Mary Prewitt*, assistant appellate defender, argued the cause, and *Wendy L. Rhyne Slayton*, special appellate defender, and *Jessica R. Kunen*, chief appellate defender, were with her on the brief for appellant.

*Tony W. Rues*, assistant district attorney, argued the cause, and *Joan M. Hamilton*, district attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: Jerome Edwards appeals his convictions for first-degree murder, aggravated robbery, and conspiracy to possess hallucinogenic drugs with intent to sell. He contends that the photographic lineup used to identify him was unconstitutionally suggestive, the district court erred in allowing the State to strike a black juror from the jury panel, the district court erred in allowing the admission of evidence of his post-*Miranda* silence, the district court erred in formulating a prejudicial response to the jury's question without his presence, the district court erred in admitting evidence of prior bad acts, and the journal entry of sentencing lists an incorrect statute number for an offense for which he was convicted. We affirm.

The events in this case concern the February 19, 1996, murder and robbery of Donnie Smart, a small-time dealer of marijuana, in Topeka. The defendant was charged with felony murder; conspiracy to possess with intent to sell, deliver, or distribute, offer for sale, or sell a hallucinogenic drug; and aggravated robbery in connection with the incident. Prior to trial, the defendant moved to suppress a photographic lineup identification. After a full hearing, the trial court denied his motion.

The State called 19-year-old Larry Huggins, Jr., who testified that he was walking down the street on the day of the killing when he was approached by two individuals, one of whom he identified as the defendant. Huggins had met the defendant previously. Huggins identified the other person with the defendant only as Shawn.

According to Huggins, the defendant and Shawn wanted to purchase two quarter-pound bags of marijuana. Huggins mentioned that he had previously purchased marijuana from Smart. Huggins stated that Smart was not a "big-time" dealer but was known to sell marijuana occasionally. Huggins was to receive a half-ounce of marijuana for arranging the deal.

Huggins testified that the group drove in his cousin's blue Ford Escort to Smart's house because Smart would know the car. They parked in front of what he thought was Smart's house and saw Smart walking down the steps of an apartment building nearby.

Smart and his family were in the process of moving from the house to the apartment building on that day. Huggins told Smart about the group's desire to purchase the marijuana, and Smart told them to come back in a couple of hours. They left, and while driving around, the defendant and Shawn asked Huggins if Smart was "somebody we could lick." Huggins felt that they were asking whether Smart would be a good person to rob.

The group returned to Smart's apartment 2 hours later. When they arrived, the defendant and Shawn went to the door. Huggins testified that both the defendant and Shawn were armed. Huggins saw Smart's wife, Heather, open the door. The defendant and Shawn then returned to the car and told Huggins that Heather had told them to come back later.

Huggins testified that when the group came back for the third time, both the defendant and Shawn were again carrying guns. According to Huggins, the defendant was carrying a blue steel .38 caliber pistol while Shawn was armed with a chrome 9 mm. pistol. Huggins testified that the defendant was wearing a starter jacket and black pants while Shawn was wearing a hooded sweatshirt. Huggins watched them walk up, knock on the door, and then go in the apartment. After approximately 5 minutes, he heard two gunshots. Huggins started the car and was going to leave when he saw the defendant and Shawn running out of the apartment. They jumped into the car and Huggins drove off.

The defendant told Huggins that Smart was drunk and had come after them so they had to shoot him. The defendant said that when they weighed the marijuana, the defendant had tried to grab it. Smart charged him, and the defendant shot into the floor once and then shot Smart in the shoulder. Huggins testified that he dropped the defendant off at his car and then went home.

Huggins admitted that he had not identified the defendant in a photographic lineup. He stated that he recognized the picture of the defendant but lied to the police and only told them the truth after he was threatened with a murder charge. Huggins stated that he was charged with conspiracy and aggravated robbery and that in return for his testimony, he would avoid being charged with murder.

Heather testified that on the day of the murder, she had been moving things in the apartment when she heard her husband whistle. He then came into the house and told her that some persons had wanted to buy a half-pound of marijuana. Heather testified that her husband used marijuana and sometimes sold small amounts. However, she was scared when she heard that someone wanted a half-pound because Smart had never sold that large an amount before. She stated that Smart reassured her by telling her that "Big Larry" (Huggins) was involved and that he had known him for awhile.

Heather testified that Smart and two friends, Raymond Slater and Jeremy Brown, left to purchase the marijuana. Heather stated that she was sick to her stomach because she was nervous, and she went to lie down with the couple's baby. She then heard a knock on the door. When she answered the door, a black male she identified as the defendant was there, asking for Smart. She told the defendant that Smart was not home but that he would be back within the hour. The defendant told her that he and his companions would return at 7:15 p.m.

Smart, Slater, and Brown came back to the apartment. Smart began weighing the marijuana. Just after 7:15, the group decided that the defendant and his companions were not coming back and began dividing the marijuana among themselves. They rolled one joint and took turns smoking it. Heather testified that she went into the kitchen and when she came back out, the front door was partially open. The defendant and another person were standing just outside. Smart told her to let them in and she did.

According to Heather, Smart approached the defendant and the other person and said, "What's up?" She believed that Smart seemed to recognize the defendant. Smart, the defendant, and the other person then went into the back of the apartment. She sat in the living room. After awhile, she heard Smart raise his voice, and Slater went back to check on the situation. Shortly thereafter, the defendant came around the corner with a silver gun in his hand shouting, "Nobody move, or I'll shoot." The defendant then turned back, and the other person came into the living room followed closely by Smart and Slater. There was pushing and shoving.

Heather testified that as they came past her, Smart tossed a bag of marijuana to her, which she threw over her shoulder into the kitchen.

A struggle ensued at the door of the apartment. Smart had his arms around the defendant's waist and was ramming his shoulder into the defendant when the defendant fired his gun. There was more scuffling, and the defendant fired again. Smart slumped to his knees. Heather ran to the telephone, dialed 911, and then ran back and unsuccessfully tried to resuscitate Smart.

When first questioned by the police, Heather did not mention the marijuana. However, when she found out that Smart had died, she told the police everything that had happened.

Heather told the police that the person with the gun was about 5'9", with cornrows in his hair, and wearing a light-colored tan or white starter jacket. She described the other person to police as wearing a gray fleece sweatshirt. However, Heather testified that when she saw the defendant's picture in the photographic lineup, she realized that she had made a mistake and that the person in the gray fleece sweatshirt, not the person with cornrows, had been the shooter. Heather stated that she looked at between 600 and 1,000 pictures in an effort to identify the shooter. However, she testified that at the moment she saw the defendant's face in the photograph, she realized he was the shooter. Heather said that "[w]hen you see your husband shot and killed in front of you and you see a face, you remember that face for the rest of your life." At trial, Heather also identified the defendant as the person who shot Smart.

Raymond Slater, a friend of Smart's who was present during the shooting, also testified. In court, he identified the defendant as the person who shot Smart. Slater stated that when the defendant and the other person arrived to purchase the marijuana, Smart motioned them into the bathroom to take care of the deal. Slater testified that the other person went into the bathroom while the defendant stayed just outside the bathroom door. Later, Slater heard Smart raise his voice and knew something was wrong. Slater went back to the bathroom to check on the situation, and he and the defendant glared at each other for approximately 5 to 10

minutes. Slater testified that while he and the defendant were staring at each other, Smart and the other person were arguing over the weight of the marijuana.

The defendant then moved into the bathroom, so Slater also went in. Slater testified that the defendant stepped around the corner, then stepped back holding a gun. According to Slater, the defendant stated, "Give us the fucking dope or else I'm going to shoot you!" Smart and the other person both grabbed for the marijuana. Slater moved in to join the scuffle, but the defendant said, "You make one more move and I'll blow your head off." The other person ran out of the bathroom followed by the defendant, Smart, and Slater. Slater testified that Smart grabbed the defendant and tried to drag him to the ground. Smart grabbed the defendant by the waist and slammed him against the door. Slater testified that he heard two shots. He swung a beer bottle at the defendant and saw Smart slump to the ground. The defendant ran out the door.

Slater stated that he ran out the door after the assailants, but someone pointed a gun at him and he backed away. He testified that the assailants got into a tan or cream-colored compact car like a Volkswagen Rabbit and drove away. He followed them to a nearby grocery store parking lot and called police from there.

Slater testified that he told police that the person he later identified as the defendant was 5'7" tall and that the other person was 6'2" or so with cornrows in his hair. Slater stated that he looked at hundreds of pictures of suspects on three occasions and when he saw the defendant's picture, he was sure the defendant was the shooter.

On cross-examination, Slater admitted that on the day of the murder he had been drinking all day but stated that he was not affected by it. Slater testified that he had been with Smart when the defendant and others drove up the first time to talk about purchasing marijuana. He stated that the defendant and the others had been in a four-door Mercury with tinted windows. When shown a picture of a car belonging to the defendant's girlfriend, he stated that it was not the car he had seen at that time. On redirect, he stated that although he wanted to see Smart's killer brought to justice, he would not want to falsely accuse anyone of

a crime because he himself had been falsely accused and he knew how it felt.

Jeremy Brown, another person present at the shooting, also testified. Brown's testimony was generally consistent with that of Slater and Heather. He testified that one of the assailants was 5'7" and about 160-65 pounds and dressed in a hooded sweatshirt. The other assailant was 6'1" and heavyset, possibly 250 pounds. Contrary to the testimony of Slater, Brown testified that the assailants escaped in a blue Ford Escort. Brown testified that this was the same Escort he had seen Huggins exit from earlier in the day.

Jeremy stated that when questioned by police, he told them that he did not know who the shooter was but if he could talk to Slater or Heather, they might be able to come up with a name. He stated that he was unable to identify the defendant as the shooter in a photographic lineup.

Kevin Igercic, another friend of Smart's who was present that evening, also testified. Igercic stated that he had been sitting in Smart's apartment waiting for his mother to pick him up when one of the people talking to Smart in the back of the apartment pulled a gun. Igercic stated that Smart and the shooter were in the living room headed for the door when the first gunshot went off. Smart tried to grab the shooter and another shot went off. After the second shot Smart said, "Kevin, dial 911" and fell over. Igercic described the shooter as being 6'1" tall and the other person as 6'4", based on his estimation of Smart's height at 5'9". Smart was actually slightly over 5'6" in height.

Igercic testified that he could not identify anyone in the lineup shown to him. He stated that at one point, he might have told police that the shooter had on an Oakland Raiders starter jacket.

According to Shawnee County Coroner Dr. George E. Thomas, Smart died as the result of a gunshot wound which entered into his left arm on a downward angle as if the arm was held above the body. The bullet then continued through the arm and into the body, fracturing a rib and penetrating the left lung, pulmonary artery, aorta, right lung, diaphragm, liver, and right kidney. Stippling on the wound indicated that the shot was fired from close

range. A second gunshot wound on the left shoulder was not a factor in Smart's death.

David A. Smith, an officer with the Topeka Police Department, testified that he was called to the shooting scene, where he recovered drug paraphernalia and marijuana from the bathroom. He also recovered two .38 caliber shell casings from the living room area.

Robert Cilwa, a KBI firearms expert, testified concerning the shell casings. Cilwa testified that the cartridges found on the scene were .38 caliber. He noted that while it was possible for .38 caliber shells to be fired from a 9 mm pistol, he did not think, based on the condition of the cartridges, that these cartridges had been fired from a 9 mm pistol.

The State also called a witness who testified that she was a prostitute who habitually worked in the neighborhood where the shooting took place. She stated that on the night of the shooting, she saw a blue Ford Escort heading down the street near Smart's apartment and saw two men exit the vehicle and go up the stairs to the apartment. However, at trial, she stated that the defendant was not one of those persons.

Detective Mike McAtee of the Lawrence Police Department stated that he went to the restaurant where Tina Ostrander, the defendant's girlfriend worked to see if the defendant was there. McAtee testified that he saw a red Toyota which belonged to Ostrander, but she was not at work. He learned that the defendant and Ostrander were at her apartment, and he and several other officers went to that apartment. McAtee stated that there was a smell of marijuana coming from the apartment. McAtee testified that he and several officers entered the apartment and placed the defendant in custody. A search of the apartment revealed drug paraphernalia and marijuana as well as a gray hooded sweatshirt.

Prior to the State's calling of witnesses to testify regarding the arrest of the defendant, the defendant renewed his objection to any discussion regarding the fact that marijuana was found at the place where the defendant was residing. The district court overruled the objection.

Cindy Patterson, a KBI forensic chemist, testified concerning both the marijuana found in the defendant's apartment and the

marijuana found at the scene of the shooting. She confirmed that both substances found were marijuana but stated that it was impossible to tell whether they came from the same batch of marijuana.

Detective McAtee also testified concerning certain field notes he had taken during an interview he conducted with Ostrander. Ostrander stated that the defendant and a man named William Burton Clay often talked to her about "ripping people off for weed." She also told him that on the night of the murder, the defendant was out of town late into the night and when he returned he told her that he had "jacked" some people.

The State called Ostrander to the stand. She testified that on the day of the shooting the defendant was fixing her car. She stated that she saw him in Lawrence between 8 and 8:30 p.m. on the evening of the shooting

Thomas Young, a detective with the Topeka Police Department, also testified on behalf of the State. Young stated that he worked on the investigation of the shooting and that he went to Lawrence with several other officers to apprehend the defendant. Young questioned the defendant after his arrest. Young testified that the defendant answered biographical questions but, when read his rights, stated that he did not want to talk further and wanted an attorney. At this point, the defendant objected on the grounds that it was impermissible to comment on his post-*Miranda* silence. The court asked whether the defendant would like a cautionary instruction, and the defendant declined.

Young testified that as he was preparing to leave the room, the defendant stated that he wanted to talk again. As Young was informing the defendant about the crime, the defendant asked, "Who says I killed whitey?" Young felt that this utterance was significant because he had not yet told the defendant that the victim was Caucasian. Young testified that the defendant first stated that he could not remember where he had been on the night of the murder. Later, the defendant told Young that he had been with his girlfriend all day and night. Finally, he told Young that he had been mistaken and that he had worked on the day in question.

The State also called Sergeant Ron Brown of the Topeka Police Department. Brown testified that he assisted the Lawrence police in apprehending the defendant. Brown stated that when the defendant was first arrested, the defendant stated, "What do you guys got me for? What? Did I rob someone? What? Did I kill someone?"

During jury deliberations, the jury sent a note to the court asking for a read back of the testimony of "Detective Young . . . or, ?" regarding the presentation of the photographic lineup to Slater. During an earlier question from the jury, the defendant was not present when the reply was being discussed. However, the defendant's attorney agreed that the defendant's presence was not necessary. Likewise, the defendant was not present when the answer to this jury question was discussed. The court called the jury in, and Young's testimony was read to the jury. The court then asked the jury if there was any other testimony that it wished to have read back. The jury indicated that it did not wish a further read back.

The defendant was found guilty of felony first-degree murder, conspiracy to possess with intent to sell hallucinogenic drugs, and aggravated robbery. He was sentenced to a controlling term of life plus 58 months in prison.

## PHOTOGRAPHIC LINEUP

The defendant contends that the photographic lineup used to identify him was unconstitutionally suggestive and tainted the in-court identifications made by Heather Smart and Raymond Slater. Where a photographic lineup procedure is challenged on the grounds that it is impermissibly suggestive, this court must analyze the totality of the circumstances to determine whether an identification is so impermissibly suggestive that it gives rise to a very substantial likelihood of irreparable misidentification. *State v. Ponds*, 227 Kan. 627, 629, 608 P.2d 946 (1980).

Before examining the totality of circumstances concerning the photographic lineup, we must consider the State's contention that the defendant waived his claim by failing to object at trial. A defendant must object to photographic lineups at trial in order to preserve that issue for appeal. See *State v. Hatch & Smith*, 223

Kan. 783, 787, 576 P.2d 687 (1978); see also *State v. Sanders*, 202 Kan. 551, 553, 451 P.2d 148 (1969) (relating to objections to the admissibility of in-court identification tainted by pretrial identification). In *Sanders*, this court noted that the failure to object to an in-court identification may be considered to be a defense strategy where the defendant elects to explore the circumstances of the pretrial identification in the presence of the jury by cross-examination. 202 Kan. at 553.

In this case, although the defendant filed a motion to suppress evidence of the photographic lineup, at trial he failed to object to either the testimony of Slater or Heather concerning their identification of the defendant from such a lineup. He also failed to object to testimony by Detectives Danny Hay and Thomas Young on the same issue. Further, the defendant failed to object to the in-court identifications made by Slater and Heather. Instead, the defendant chose to attack the circumstances surrounding the photographic lineup and identification in front of the jury through the cross-examination of Slater and the detectives. Under these circumstances, the defendant failed to preserve his objections concerning the photographic lineup.

Even if we were to examine the lineup and conclude that the lineup was unduly suggestive, the defendant would not be entitled to a new trial so long as a substantial likelihood of misidentification does not exist. See *State v. Skelton*, 247 Kan. 34, 40, 795 P.2d 349 (1990). In-court identifications are capable of standing on their own even if preceded by deficient pretrial confrontations. *State v. Ponds*, 227 Kan. at 630. The question is whether the in-court identifications are reliable. 227 Kan. at 630.

In order to test the reliability of courtroom identification, the factors to be considered are (1) the opportunity of the witness to view the accused at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the accused, (4) the level of certainty displayed by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. *Neil v. Biggers*, 409 U.S. 188, 199-200, 34 L. Ed. 2d 401, 93 S. Ct. 375 (1972); *State v. Baker*, 227 Kan. 377, 379, 607 P.2d 61 (1980). An eyewitness identification due process

determination is a mixed question of law and fact, and our review is de novo. *State v. Mack,* 255 Kan. 21, 26, 871 P.2d 1265 (1994).

### (1) Opportunity to view the accused at the time of the crime

Both Heather Smart and Raymond Slater had ample opportunity to view the shooter. Heather indicated that the shooter had earlier come to the door looking for her husband. Later, she saw the shooter standing in the hall and let him in the apartment. She then observed the shooter when he brandished the gun and ordered her not to move, and also observed the shooter during the scuffle with Smart. In the same manner, Slater not only saw the shooter when he entered the house, but he and the shooter spent approximately 5 minutes staring at each other as Smart and the other person argued.

### (2) Degree of attention

Both Heather and Slater had ample reason to be attentive to the situation at hand. Slater was involved in carefully watching the defendant as the confrontation escalated. Heather stated that she had been on edge all evening because of the large amount of marijuana involved in the transaction and her fear that something might go wrong with the transaction.

### (3) Accuracy of the prior description

The third *Biggers* factor, the accuracy of the witnesses' prior description, is difficult to assess in this case. Slater described the shooter as being 5'7" to 5'8" tall with short, almost shaved, hair. Heather described the shooter as 5'9" tall with short, almost shaved, hair. However, there is no evidence in the record as to the defendant's height or hairstyle. It should be noted that Heather described the shooter to police as having a cornrow hairstyle, although she later testified that she was confused at the time and only later realized that the shooter was not the one with cornrows. On the whole, both Slater's and Heather's descriptions of the shooter were consistent with each other, but it is difficult to determine whether they were consistent with the actual physical characteristics of the defendant.

(4) Level of certainty displayed by the witness at the confrontation

This factor weighs heavily in favor of the reliability of the identification. Detective Young testified at the hearing on the defendant's motion to suppress that when Heather came to the defendant's picture in the lineup, she began crying and shaking. He also testified that Slater pulled the defendant's picture out of the lineup and, after studying the other pictures, stated that the defendant was one of the persons involved in the shooting. Both Heather and Slater were similarly confident with their in-court identifications. Slater testified that he would not accuse the defendant if he was not "100 percent sure it was him," and Heather stated, "When you see your husband shot and killed in front of you and you see a face, you remember that face for the rest of your life."

(5) Length of time between the crime and the confrontation

The shooting occurred on February 19, 1996, and the photographic lineup was shown to Heather and Slater on March 29, 1996, a little over a month later. The witnesses' in-court identifications were made on July 9, 1996. Neither passage of time is so great as to undermine the reliability of the identification.

Upon our consideration of the totality of circumstances, we conclude that the identification procedure used in this case was not so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.

## PEREMPTORY STRIKE ON BASIS OF RACE

The defendant argues that the State's use of a peremptory strike to strike a prospective juror from the jury panel violated his constitutional right to a fair trial under *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986). Specifically, the defendant contends that the reason given by the State for the strike was not race-neutral and, therefore, violated the Equal Protection Clause of the United States Constitution.

The circumstances giving rise to this contention began with the State's announcement that it wished to strike a prospective juror and the defendant's objection. The following colloquy occurred:

"The Court: You're raising the question, I take it, that [the prosecutor] has struck juror number 16 . . . and she is not, obviously, a black woman, though she may have some general negroid characteristics. [The defense attorney] is asking for a neutral reason for striking. [Prosecutor], your response?

"[Prosecutor]: First of all, we don't think she's a minority, but he hadn't stated in terms of *Batson,* he has to come forward in terms of prima facie case. We reviewed *Batson* in a particular area.

"The Court: Which, would you mind stating your reason for challenging her?

"[Prosecutor]: I can go back and look on our thing. The only thing is, we have not been tracking it due to our intention that she was white.

"The Court: I'm not sure she's a black woman either.

"[Defense Counsel]: I can't say that for sure.

"The Court: What I'm saying is, the record would be clean if you can show me from your notes and/or tell us why you're striking her."

The State then informed the court that the reason for the strike was that the juror was a "young woman business person." The judge noted that *Batson* was equally applicable to women but stated, "I'm going to note his objection. I feel I wanted to clear the record as best we could."

The defendant contends that the State's striking of the juror on the basis that she was a woman was not a race-neutral reason; therefore, his rights were violated.

In *Batson,* the United States Supreme Court set out a framework designed to prevent the discriminatory exclusion of jurors on the basis of race. Under the *Batson* framework, the defendant must first make a prima facie case showing that the prosecutor has exercised peremptory challenges on the basis of race. Once such a showing has been made, the burden shifts to the prosecutor to articulate a race-neutral reason for striking the juror. The trial court must then determine whether the defendant has carried the burden of proving purposeful discrimination. See *Hernandez v. New York,* 500 U.S. 352, 358-59, 114 L. Ed. 2d 395, 111 S. Ct. 1859 (1991).

The Court in *Batson* found that in order to establish a prima facie case, the defendant must first show that he or she is a member of a cognizable racial group and that the prosecution has exercised peremptory challenges to remove from the venire members of the defendant's race. *Batson,* 476 U.S. at 96. The defendant is entitled

to rely on the fact that peremptory challenges constitute a jury selection practice that permits those who are of a mind to discriminate to do so. The defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude jurors from the jury on account of their race. 476 U.S. at 96.

This framework has been extended beyond the initial set of circumstances in *Batson*. In *Powers v. Ohio*, 499 U.S. 400, 113 L. Ed. 2d 411, 111 S. Ct. 1364 (1991), the United States Supreme Court determined that the *Batson* framework extended to a challenge by a white defendant to the prosecutor's use of peremptory strikes to exclude prospective black jurors on the basis of race. In reaching this conclusion, the Court determined that the Equal Protection Clause prohibits the use of peremptory challenges to exclude otherwise qualified and unbiased persons from the jury panel solely by reason of their race and that a defendant has standing to raise the juror's equal protection claims. 499 U.S. at 409-15. Further, in *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 128 L. Ed. 2d 89, 114 S. Ct. 1419 (1994), the Court extended the *Batson* framework to prohibit discrimination based on gender. In so doing, the Court stated:

"[T]he Equal Protection Clause prohibits discrimination in jury selection on the basis of gender, or on the assumption that an individual will be biased in a particular case for no reason other than the fact that the person happens to be a woman or happens to be a man. As with race, the 'core guarantee of equal protection, ensuring citizens that their State will not discriminate. . . , would be meaningless were we to approve the exclusion of jurors on the basis of such assumptions, which arise solely from the jurors' [gender].' [Citation omitted.]" 511 U.S. at 146.

These rulings have changed the requirements for the establishment of a prima facie case. The defendant need no longer establish that he or she is a member of a cognizable minority group since the focus is now on the individual rights of jury members not to be excluded on the basis of race or sex. See *Powers v. Ohio*, 499 U.S. at 415; *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. at 140-41. Thus, in order to establish a prima facie case, the defendant need only show that the prosecution has exercised peremptory chal-

lenges to remove from the venire members of a certain race or gender and that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the jurors from the jury on account of their race or gender. *Batson*, 476 U.S. at 96.

The first question to be addressed is whether the defendant established a prima facie case of discrimination. It is true that "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant has made a prima facie showing becomes moot." *Hernandez v. New York*, 500 U.S. at 359. However, this general rule is not applicable in this case due to the strange procedure used by the district court.

The trial court in this case failed to conduct a proper *Batson* investigation in that it made no ruling as to whether the defendant had established a prima facie case. Instead, the court simply asked the State for a race-neutral reason for the strike. The State, still protesting the fact that it believed the prospective juror was white, came forth with a reason. The court then made no ruling on whether the reason was race-neutral and did not continue under the *Batson* framework, nor did the court make a ruling on the ultimate question of discrimination. Under these circumstances, the question of whether a prima facie case was established is not moot and must be examined by this court.

The defendant challenged the State's peremptory strike on the basis of race, not gender. Thus, our analysis is not the same as that in *J.E.B. v. Alabama ex rel. T.B.*, which concerned a situation where the challenge to the peremptory strike was on the basis of gender. However, the Supreme Court in *J.E.B.* also noted that "[b]ecause gender and race are overlapping categories, gender can be used as a pretext for racial discrimination." 511 U.S. at 145. The Court stated: "Allowing parties to remove racial minorities from the jury not because of their race, but because of their gender, contravenes well-established equal protection principles and could insulate effectively racial discrimination from judicial scrutiny." 511 U.S. at 145. The defendant claims that this is exactly what occurred in his

case. In other words, he claims that the State used gender to effect racial discrimination.

When analyzing the defendant's claim, it is important to keep in mind that the challenge is to race. In order to establish a prima facie case, the defendant must first show that the prosecution has exercised peremptory challenges to remove from the venire members of a certain race. The defendant's claim fails at this point. Although the defendant claims that the prospective juror was black, the defendant failed to prove that point. Even defendant's counsel admitted that he could not say for certain that the prospective juror was black. Thus, the defendant failed to establish the first crucial requirement of the *Batson* analysis, which is the establishment of a prima facie case of racial discrimination. The defendant's claim of racial discrimination, therefore, fails.

## POST-*MIRANDA* SILENCE

The defendant's argument centers on the testimony of Detective Young regarding the questioning of the defendant at the police station. Young testified that the defendant answered biographical questions but, when read his rights, stated that he did not want to talk further and wanted an attorney. The defendant objected on the ground that it was impermissible to comment on his post-*Miranda* silence. The court asked whether the defendant would like a cautionary instruction, which the defendant declined.

It is constitutionally impermissible for the State to elicit evidence at trial of an accused's post-*Miranda* silence. *Doyle v. Ohio*, 426 U.S. 610, 618, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976); *State v. Gadelkarim*, 256 Kan. 671, 685, 887 P.2d 88 (1994). A *Doyle* violation occurs when the State attempts to impeach a defendant's credibility at trial by arguing or by introducing evidence that the defendant did not avail himself or herself of the first opportunity to clear his or her name when confronted by police officers but instead invoked his or her constitutional right to remain silent. *State v. Brinkley*, 256 Kan. 808, 820, 888 P.2d 819 (1995).

The defendant chose not to have the district court instruct the jury to disregard the statement. Such an instruction, if given, has been held to cure many improper comments made by the prose-

cution. See *State v. Spresser*, 257 Kan. 664, 668-72, 896 P.2d 1005 (1995). In fact, regarding improper comments by the prosecutor, we have held that where the jury has been instructed to disregard the remarks, there is no basis for reversal unless the remarks were so prejudicial as to be incurable. *State v. Warbritton*, 215 Kan. 534, Syl. ¶ 1, 527 P.2d 1050 (1974). In this case, the defendant's express refusal of a curative instruction denied the court the chance to cure the error.

Nevertheless, in this case there is no question that a violation of defendant's post-*Miranda* silence occurred. The crucial question is whether the violation was so prejudicial as to require a new trial. This question is measured by the constitutional standard of harmless error, which is based on a belief beyond a reasonable doubt that the error did not contribute to the verdict. In determining the issue, we consider the nature and extent of the comment in comparison with the strength of the evidence of the defendant's guilt as well as whether the evidence was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the defendant to testify. *State v. Davis*, 255 Kan. 357, 362, 874 P.2d 1156 (1994).

This is not a case where the evidence was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the defendant to testify. Instead, the defendant's expressed intention to exercise his post-*Miranda* right to counsel was simply stated in passing by the witness. It was objected to immediately. No comments were made by the State regarding this assertion of rights in closing arguments. See *State v. Beebe*, 244 Kan. 48, 54, 766 P.2d 158 (1988) (reversible error where prosecutor's closing argument highlighted the defendant's failure to testify). The testimony immediately following was that the defendant then did agree to talk to the police and asserted his innocence. We conclude that the prejudicial value of the evidence was not great; there is little chance that a jury would consider it to be a comment on the defendant's failure to immediately assert his innocence. We have no hesitation in concluding beyond a reasonable doubt that the evidence had no effect on the jury's verdict.

## RESPONSE TO THE JURY'S QUESTION

The defendant contends that the trial court erred in formulating a response to a jury request at a time when he was not present. He argues that he was not there to contribute his thoughts to the formulated answer and he was, therefore, denied a fair trial.

During deliberations, the jury requested a read back of the testimony of "Detective Young . . . or, ?" regarding the photographic lineup shown to Raymond Slater and Heather Smart. After conferring with counsel for both the State and the defendant, the court called in the jury. Then, in the presence of both the jury and the defendant, the court noted the jury's question, had Detective Young's testimony regarding the lineup read back to the jury, and asked the jury if it requested any other testimony to be read back. The jury indicated that it did not desire more testimony.

A defendant has the constitutional right to be present at all critical stages of the trial. *State v. Johnson*, 258 Kan. 61, 68, 899 P.2d 1050 (1995). This right is codified in Kansas in K.S.A. 22-3405(1). In this case, the defendant was present when the court communicated the answer to the jury. The defendant was not present, however, during the conference between the court and both counsel regarding the answer to be given the jury. In determining whether a proceeding is a critical stage, this court must examine whether the defendant's presence is essential to a fair and just determination of a substantial issue. See *State v. Knapp*, 234 Kan. 170, 180, 671 P.2d 520 (1983). A defendant does not have the right to be present at proceedings before the court involving matters of law. *State v. Minski*, 252 Kan. 806, 815, 850 P.2d 809 (1993).

The record reveals that approximately 1 hour prior to the jury's request for a read back regarding the lineup, the jury requested a transcript of the testimony of Larry Huggins. The court and counsel met without the defendant to formulate a response. At that time, the court asked counsel if they agreed that it was not necessary to have the defendant present. The defendant's counsel agreed. Contrary to the State's argument that the defendant waived his right to be present, we do not presume waiver from a silent record. See *State v. Boyd*, 257 Kan. 82, 88-89, 891 P.2d 358 (1994)

(presence of defendant will not be presumed where record is silent; defendant did not waive challenge to answer to jury's request); *State v. Antwine*, 4 Kan. App. 2d 389, 401, 607 P.2d 519 (1980) (holding that waiver of a defendant's right to be present will not be presumed from a silent record). However, in this case, no answer to the jury was formulated in the conference with counsel concerning the jury question. The conference between the court and counsel was more akin to a conference regarding jury instructions. We have held that in such a case, the presence of the defendant is not necessary. *State v. Mantz*, 222 Kan. 453, 463-64, 565 P.2d 612 (1977).

We find no merit in the defendant's contention. While the answer to the jury inquiry was discussed between counsel and the court, the court, in the presence of both the jury and the defendant, had Detective Young's testimony regarding the lineup read back to the jury. The court then asked the jury if it requested any other testimony read back. The jury indicated that it did not desire more testimony. The trial court's action was consistent with K.S.A. 22-3420(3), requiring that once the jury has begun deliberations, any questions from the jury concerning the law or evidence pertaining to the case must be answered in open court in the defendant's presence unless the defendant is absent voluntarily. See *Crease v. State*, 252 Kan. 326, 333, 845 P.2d 27 (1992).

Even if we were to determine that the defendant had a right to be present at the conference regarding the jury's request for the read back, his absence still does not require reversal if the error can be deemed harmless. See *Crease v. State*, 252 Kan. at 334. An error of this type may not be held to be harmless unless the appellate court is willing to declare a belief that the error had little, if any, likelihood of changing the result of the trial. 252 Kan. at 334.

In the case at hand, it is apparent that the defendant not being at the conference had little if any likelihood of changing the result of the trial. The defendant was represented by counsel at the conference. No final answer to the jury's request was formulated at the conference; rather, the jury's request was answered and discussed in open court with the defendant present. At this time, the

defendant had the opportunity to raise any questions himself or through counsel that he may have had concerning the method chosen by the trial court in reading back requested testimony.

## ADMISSION OF EVIDENCE OF OTHER BAD ACTS

The defendant contends that the admission of evidence that marijuana and drug paraphernalia were found during the search of his girlfriend's apartment, and evidence that Tina Ostrander had told officers that the defendant would often talk of "ripping off" drug dealers, denied him a fair trial.

The first error argued by the defendant as part of this issue concerns the admission of evidence that he had a habit of stealing from drug dealers. Detective McAtee testified that he interviewed Ostrander and she told him that the defendant and a friend, William Burton Clay, would sometimes talk about "ripping off" people for "weed." According to McAtee, Ostrander also told him that often the defendant would argue with drug dealers over the weight of the drugs and the defendant would have to "mob out" before things got out of hand.

K.S.A. 60-455 prohibits the admission of evidence that a person committed a crime or civil wrong on a specified occasion to prove that person's disposition to commit a crime or civil wrong as the basis for an inference that the person committed another crime or civil wrong on another specified occasion. *State v. Gibbons*, 256 Kan. 951, 960, 889 P.2d 772 (1995). Instead, such evidence is admissible only when relevant to prove some other material fact, including motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. 256 Kan. at 960.

The defendant objected to the above testimony on the basis of lack of notice. The record reveals no objection to the testimony of McAtee on the basis of K.S.A. 60-455. A defendant may not object to the introduction of evidence on one ground at trial and then assert a different objection on appeal. *State v. Toney*, 253 Kan. 651, 656, 862 P.2d 350 (1993).

The defendant did timely object to the introduction of the marijuana found in his apartment at the time of his arrest 10 days after the date of the crime. The court stated that the evidence

would be admitted on the basis of res gestae and its relevance to the charge of conspiracy to possess with intent to sell. The State introduced testimony from Detective McAtee that marijuana was recovered from the defendant's apartment along with drug paraphernalia. Cindy Patterson, a KBI forensic chemist, testified that both the marijuana recovered from the crime scene and the marijuana recovered from the defendant's apartment were, in fact, marijuana. However, she testified that there is no possible way to tell if the marijuana was from the same batch.

The concept of res gestae has generated some confusion. Res gestae deals with the admissibility of evidence of acts done as well as declarations made before, during, or after the occurrence of the principal event. These acts or declarations are admissible as part of the res gestae where those acts or declarations are so closely connected with the principal occurrence as to form in reality a part of the occurrence. *State v. Sanders*, 258 Kan. 409, 422, 904 P.2d 951 (1995). Res gestae includes those circumstances or acts which are automatic and undesigned incidents of the particular litigated act and which may be separated from the particular act by lapse of time but are illustrative of that act. It is the whole of the transaction under investigation or being litigated. 258 Kan. at 423. These acts or declarations may be admissible as part of the res gestae to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake. 258 Kan. at 423.

Acts done or declarations made as part of the res gestae are not admitted into evidence without limitation but are governed by the procedural rules and rules of evidence set out in Article 4, chapter 60, of the Kansas Statutes Annotated. *State v. Clark*, 261 Kan. 460, 471, 931 P.2d 664 (1997). Thus, in order to be admissible, evidence must still conform to the requirements of K.S.A. 60-460. Wide latitude is given to the district court in determining whether evidence constitutes part of the res gestae. *State v. Sanders*, 258 Kan. at 423.

The facts in this case are strikingly similar to a recent decision by this court in *State v. Bornholdt*, 261 Kan. 644, 932 P.2d 964 (1997). Bornholdt was charged with criminal possession of a firearm and first-degree murder. A search of his car 10 days after the

crime revealed drugs and drug paraphernalia. The district court admitted the drugs and drug paraphernalia under the theory of res gestae. We disagreed, noting that for matters to be admissible as res gestae, they must be so closely connected that they form a part of the occurrence. We found that because the search was conducted 10 days after the alleged murder, there was no justification for the admission of the evidence as it was clearly not part of the res gestae. We noted that while the rule is generally that evidence of items seized at the time an accused person is arrested is admissible, the evidence must logically tend to connect the accused with the crime charged. 261 Kan. at 658-60.

*Bornholdt* applies to the facts in this case. In order to form part of the res gestae, the discovery of the marijuana in the defendant's apartment must be so closely related to the crime as to form a part of the occurrence. The crime in this case was committed February 19, 1996, while the search of the defendant's apartment occurred March 25, 1996, some 5 weeks later. There was no direct connection between the marijuana found in the search and the marijuana allegedly taken from Smart in the murder. The marijuana found 5 weeks later in the defendant's apartment is not part of the res gestae.

In addition to finding that the evidence was part of the res gestae, the trial court found that the evidence was relevant to prove the conspiracy to possess marijuana with intent to distribute charge. This court has long held that evidence which has relevance in proving the crime at issue is admissible independent of K.S.A. 60-455, even if it discloses another or independent offense. *State v. Sexton*, 256 Kan. 344, Syl. ¶ 1, 886 P.2d 811 (1994); *State v. Peck*, 237 Kan. 756, 762, 703 P.2d 781 (1985). Evidence is relevant if it renders the desired inference more probable than it would be without the evidence or if it has any tendency in reason to prove any material fact. *State v. Sexton*, 256 Kan. 344, Syl. ¶ 1.

In this case, the defendant was charged with conspiracy to possess marijuana in connection with the theft of marijuana from Smart. There was no connection established between the marijuana in the apartment and the marijuana taken from Smart. The only possible value the evidence has in connection with the con-

spiracy to possess charge is that it creates the inference prohibited by K.S.A. 60-455—that the defendant, because he possessed marijuana when found, is likely to have conspired to possess marijuana and thus conspired to possess Smart's marijuana. Absent any indication of a connection between the marijuana in the apartment and the marijuana taken from Smart, it has no relevance to the murder charge.

Because the evidence of the marijuana found in the apartment of the defendant's girlfriend was not part of the res gestae and had no relevance to prove the crime at issue, its admission by the district court was error. However, this error need not mandate reversal if it did not affect the substantial rights of the defendant. See *State v. Bornholdt,* 261 Kan. at 660.

## HARMLESS ERROR

While identity was an issue in this case, the defendant was identified by two eyewitnesses. A participant in the crime also identified the defendant as being involved.We have reviewed the eyewitness identification testimony and concluded that the identification procedure used in this case was not so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. The defendant's own incriminating statements bolster the other evidence of guilt in this case. On the basis of the record before us, we conclude that the admission of the evidence, while error, is harmless error.

## NUNC PRO TUNC ORDER

The defendant argues that a nunc pro tunc order is necessary to correct an error in the journal entry of sentencing. The journal entry in this case incorrectly lists the defendant's offense of conspiracy to possess with intent to sell hallucinogenic drugs as an offense under K.S.A. 1996 Supp. 65-4161. The actual offense is defined by K.S.A. 1996 Supp. 65-4163. The State agrees that the journal entry is incorrect but suggests that a nunc pro tunc order has already been issued. The record contains no such order. We, therefore, remand for entry of a nunc pro tunc order to correct the journal entry of sentence.

Affirmed and remanded for correction of the journal entry of sentence.

SIX, J., concurring: The majority opines that "the concept of res gestae has generated some confusion." I agree. Res gestae, as the majority observes, is governed by Article 4, Chapter 60 of Kansas Statutes Annotated. In *State v. Jones,* 204 Kan. 719, 728, 466 P.2d 283 (1970), we said:

> "In 1964 Kansas adopted the code of civil procedure which included 'Article 4.—Rules of Evidence.' K.S.A. 60-402 states the scope of the rules as follows:
>
> > 'Except to the extent to which they may be relaxed by other procedural rule or statute applicable to the specific situation, the rules set forth in this article shall apply in every proceeding, both criminal and civil, conducted by or under the supervision of a court, in which evidence is produced.'
>
> *"Thus, the rules of evidence have been codified and govern in all cases notwithstanding the prior case law which might be inconsistent with the statute."* (Emphasis added.)

Our holding here, and in *State v. Clark,* 261 Kan. 460, 471, 931 P.2d 664 (1997), focuses on the codification of the Kansas rules of evidence. Res gestae as a concept is obsolete, has outlasted its usefulness, and should be abolished. See Prater and Klemme, *Res Gestae Raises Its Ugly Head,* 65 J.K.B.A. 24 (Oct. 1996). As a federal matter, in view of adoption of the Federal Rules of Evidence, res gestae is no longer part of the law of evidence. *Stephens v. Miller,* 13 F.3d 998, 1003 (7th Cir.), *cert. denied* 513 U.S. 808 (1994) (quoting *Miller v. Keating,* 754 F.2d 507, 509 [3d Cir. 1985]).